**UNITED STATES of America,**
**Appellee,**

v.

**Paul L. CAFARO and Richard Schulman,**
**Defendants-Appellants.**

**Nos. 393, 402, Dockets 71-1922, 71-1950.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 5, 1972.

Decided Feb. 2, 1972.

Certiorari Denied May 15, 1972.
See 92 S.Ct. 1769.

Charles A. Stillman, New York City (Botein, Hays, Sklar & Herzberg, New York City on the brief), for appellant Cafaro.

Alan Scribner, New York City (Albert Krieger, New York City on the brief, Ivan S. Fisher, New York City, of counsel), for appellant Schulman.

Maurice M. McDermott, Asst. U. S. Atty., New York City (Whitney North Seymour, Jr., U. S. Atty., for the S. D. of N. Y., New York City, and Rudolph W. Giuliani, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before FRIENDLY, Chief Judge, and MOORE and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Richard Schulman and Paul L. Cafaro appeal from judgments of conviction entered after a six day jury trial in the Southern District of New York. Appellants and two others, Alfred Mainetti and Jack J. Virga, were charged with having conspired to use extortionate means to collect, and to attempt to collect, extensions of credit and to punish persons for the nonrepayment of extensions of credit in violation of 18 U.S.C. §§ 891, 894 and with having committed the substantive offenses on two occasions. Defendants Schulman, Cafaro and Mainetti were tried together, Virga having died before trial. At the close of the Government's case, the charges against Mainetti were dismissed. The jury returned verdicts of guilty on all three counts as to both Schulman and Cafaro.

On this appeal, appellants contend that they were denied a fair trial because certain allegedly prejudicial hearsay declarations were improperly admitted. Cafaro also contends that the evidence was insufficient to support his conviction. As answers to both contentions rest on an evaluation of the evidence independent of the hearsay declarations, a somewhat detailed description of this evidence is required.

*The Facts*

The victim of the extortionate scheme was Lawrence Fitzgerald, part owner of the Fitzgerald Tile Company in Poughkeepsie, New York, and a heavy gambler. During the spring of 1970, he and the defendant Mainetti, also a heavy gambler, would pool their bets and place them with bookmakers in New York City and upstate New York. As a result of this arrangement, Mainetti came to

owe Fitzgerald approximately $5,500. Subsequently, Mainetti introduced Fitzgerald to bookmakers in New York City who agreed to accept up to $5,000 in bets directly from Fitzgerald on the understanding that Mainetti would guarantee Fitzgerald's losses. Shortly after this agreement was reached, Fitzgerald sustained over $5,000 in gambling losses. When he approached Mainetti asking him to cover the losses, Mainetti informed him that he was indebted to various bookmakers for approximately $20,000 and that he was then unable to pay any of the money he owed. Some time after this conversation, Mainetti was able to settle some of his debts. However, neither he nor Fitzgerald did anything to satisfy Fitzgerald's debt to the New York City bookmakers.

For five months, until November, 1970, no one communicated with Fitzgerald about his debt. Then, on November 24, Mainetti advised Fitzgerald that the bookmakers were not going to forget the debt and that he should prepare himself for a call from someone interested in settling the debt. This conversation spurred Fitzgerald into telephoning the F.B.I. in Poughkeepsie.

On November 25, Cafaro telephoned Fitzgerald and arranged a meeting to discuss the debt. When they met, Fitzgerald, in response to Cafaro's declaration that he was going to have to pay, protested that Mainetti owed the money. Cafaro remained firm in his position. Finally, Fitzgerald agreed to make some arrangements for the payment of the debt but asked that he not be subjected to any "strongarm people" during future negotiations. Cafaro said there was a good possibility the request could be granted.

Two days later, Fitzgerald spoke with Mainetti to determine what arrangements could be made to settle the debt. No answer was forthcoming. During this conversation Fitzgerald was informed that the "New York people" were thinking of adding an interest charge onto his debt. Had this charge proved necessary, the debt would have risen to $8,600.

On December 1, Cafaro arrived at Fitzgerald's place of business driving a Lincoln Continental Mark III. The Government established that this car had been borrowed by Richard Schulman from a friend for his personal use. The appellant Schulman, however, was not then in Cafaro's company.

After the car was parked, Cafaro approached Fitzgerald and asked him to enter the car in order to discuss the debt. Fitzgerald complied with the request. On Cafaro's instructions, Fitzgerald sat on the rear seat of the car while Cafaro seated himself in the driver's seat. The defendant Virga was sitting next to Cafaro. Then, while Cafaro drove, Virga threatened Fitzgerald stating "This is the mob. We have to get paid." (Tr. p. 41) [1] Fitzgerald was ultimately reduced to tears. After Cafaro promised to help eliminate any interest charge, Fitzgerald agreed to stop stalling and to pay the debt. Part of the debt was then paid. Later, as Virga was leaving, Virga told Cafaro that he was responsible for collecting the remaining part of the debt which was to be paid in five or six days.

A week later, on the 7th of December, Mainetti telephoned Fitzgerald and asked him to pay the balance of the debt to him. Fitzgerald responded that he would only pay a representative from New York City. Then Cafaro telephoned and also asked Fitzgerald to hand the money over to Mainetti. Again Fitzgerald refused. Later in the day, Fitzgerald met Mainetti and was informed that "They said to tell you it's the bottom of the ninth." (Tr. p. 55). [2]

The following day Fitzgerald received a telephone call from someone who iden-

1. "Tr." refers to the trial transcript.

2. Among baseball fans, such as Fitzgerald, this phrase would be understood as an implied threat; the conspirators were tiring of the "game" Fitzgerald was playing in refusing to pay Mainetti.

tified himself as "the boss." Fitzgerald and "the boss" arranged for someone to meet Fitzgerald the following day to discuss payment of the debt. Telephone company documents established that this call was placed from Schulman's residence.

On December 9, at approximately 1:20 P.M., Schulman was observed by an F. B.I. agent driving his Lincoln Continental near Cafaro's residence. The car was later seen parked in Cafaro's driveway. At approximately 2 P.M., Fitzgerald received a telephone call from Mainetti who advised Fitzgerald to pay the money to him. Fitzgerald refused. Then Cafaro got on the phone, informed Fitzgerald that he was with "the man" and told him that "we'll be over in a few minutes." (Tr. p. 59). Shortly thereafter, Cafaro, driving his own car with Schulman as his sole passenger, arrived at Fitzgerald's tile company. They were followed by Mainetti who had driven another car. Cafaro then directed Fitzgerald to pay Mainetti. Fitzgerald complied. Subsequently, the four named defendants were arrested.

### The Hearsay Declarations with Respect to Schulman

Appellant Schulman contends that all the out-of-court declarations attributed to Mainetti were improperly admitted.[3] In particular, his argument rests on the purported prejudice flowing from three of these declarations. His theory is that since the charges against Mainetti were dismissed, the latter's declarations could no longer come within the exception to the hearsay rule regarding co-conspirators. We disagree.

■ The determination of whether hearsay declarations are admissible under the "co-conspirator" exception to the hearsay rule does not rest on finding sufficient evidence to submit a charge of

conspiracy to the jury with respect to either the declarant or the defendant against whom the declarations are offered.[4] Rather, the threshold question is whether the Trial Judge could conclude, after all the evidence is in, that the prosecution had established the declarant's and the defendant's participation in the conspiracy "by a fair preponderance of the evidence independent of the hearsay utterances." Geaney, supra, at 1120. Applying this standard to the above facts, we conclude that the Trial Judge was correct in answering this initial question affirmatively.

■ The Trial Judge ultimately dismissed the charges against Mainetti after concluding that it was "pretty speculative as to whether he [Mainetti] was involved in this or whether he was a victim with Fitzgerald." (Tr. p. 422). While this conclusion apparently served to absolve Mainetti of criminal culpability, it cannot obscure the fact of Mainetti's extensive participation in the conspiracy. There can be no doubt as to Mainetti's standing as a well informed agent of the conspirators. With one possible exception, discussed below, the evidence was more than sufficient to support the Trial Judge's reliance upon the "co-conspirator" exception to the hearsay rule. Cf. United States v. Lev, 276 F.2d 605, 608 (2d Cir.), cert. denied, 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960); United States v. Miller, 246 F.2d 486, 490 (2d Cir.), cert. denied, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957); United States v. Olweiss, 138 F.2d 798 (2d Cir. 1944).

Having found sufficient evidence of Mainetti's participation in the conspiracy, we must determine whether his declarations were made in furtherance of the conspiracy. With respect to this issue, we find that two and possibly all three of the three contested declarations

---

3. In its brief the Government asserted that defense counsel failed to make proper objections to the admission of the hearsay declarations. A review of the transcript proves this claim to be without merit. (Tr. pp. 415, 444)

4. United States v. Geaney, 417 F.2d 1116, 1119–1120 (2d Cir. 1969), cert. denied, Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), and cases cited therein.

were properly admitted. The first of these was made on November 24 during the conversation in which Mainetti advised Fitzgerald that his debt had not been forgotten. According to Fitzgerald Mainetti stated that "the Kingston bookmaker had made a statement that I won eight to ten thousand dollars through him and that . . . the people in New Paltz knew about it"—the people in New Paltz being—"Sonny and Richie." (Tr. pp. 32–33).[5] As the appellants contend, there is no doubt that the jury properly inferred that "Richie" was the defendant Richard Schulman and "Sonny" the defendant Paul Cafaro. However, it is similarly indisputable that the statement was in furtherance of the conspiracy; Fitzgerald was on notice that protestations of poverty would be of little avail when he was asked to pay the debt. The second statement which was properly admitted was made on December 7, at which time Mainetti was attempting to convince Fitzgerald to settle the debt by merely handing him the money. During this conversation, Mainetti explained his own fear of the conspirators; it was because "Richie had him in three businesses." (Tr. p. 52).[6] As this statement made the power of the conspirators evident, it was also made in furtherance of the conspiracy.

The sole statement which may have been improperly admitted appeared in Fitzgerald's testimony on the first day of the trial. Mainetti apparently told Fitzgerald in June that "a Jewish shylock fellow" named "Richie" had helped him settle some of his debts with various bookmakers. (Tr. p. 28). As there was little evidence indicating that this statement was made in furtherance of the conspiracy, or, indeed, that Mainetti had yet become a party to it, we must determine whether its admission was prejudicial.

After a careful evaluation of the evidence we find that the admission of the statement, which was not referred to in any later testimony and was not mentioned in the prosecutor's summation, was harmless error. At most, the jury might have considered the statement as a slight addition to their information about the "Richie" who had Mainetti in three businesses and the "Richie" who was sufficiently well situated to be informed by the bookmakers of Fitzgerald's winnings. The significance of the statement is further diminished when considered in light of the other evidence and all the reasonable inferences therefrom. Thus, shortly after Cafaro spoke with Fitzgerald by telephone and announced that he was with "the man" and stated that "we'll be over in a few minutes", Schulman was present as the sole passenger in a car from which Cafaro directed Fitzgerald to pay Mainetti. Next there was the telephone call from Schulman's residence in which "the boss" discussed arrangements for the payment of the debt. Finally, there is the use of Schulman's Lincoln Continental by Virga and Cafaro to aid in the attempt to intimidate Fitzgerald. As the possible error was

---

5. The Government could have argued for the admission of this declaration on the theory that it was a "verbal act" and not hearsay at all. As a "verbal act" the declaration could have been offered as circumstantially probative of an implied threat but not as proof of anything asserted in the utterance. As such it might have been admissible against Mainetti and all other defendants whose participation in the conspiracy was established by independent evidence. Cf., Lutwak v. United States, 344 U.S. 604, 617–619, 73 S.Ct. 481, 97 L.Ed. 593 (1953); United States v. Bennett, 409 F.2d 888, 895 n. 6 (2d Cir.), cert. denied sub nom. Haywood v. United States and Jessup v. United States, 396 U.S. 852, 90 S.Ct. 117, 24 L.Ed.2d 101 (1969); United States v. Costello, 352 F.2d 848, 853–855 (2d Cir. 1965), rev'd on other grounds, Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). However, as the declaration was clearly admissible as evidence of the truth of the matter asserted, enabling the jury to draw all reasonable inferences therefrom, we need not determine whether the declaration would have also been admissible on the alternative ground.

6. Cf., fn. 5.

harmless, Schulman's judgment of conviction is affirmed.

*Cafaro's Contentions*

 Cafaro also claims that he was prejudiced by the admission of certain hearsay declarations. As he has failed to point to any such declarations and as we have discovered none, the contention can be dismissed as being without merit. Similarly without merit is his claim that there was insufficient evidence to support his conviction as to all three counts. He was present at every stage of the conspiracy and was one of its more active participants. His judgment of conviction and the order denying his motion for acquittal or a new trial are affirmed.

Judgments of convictions and order affirmed.