**UNITED STATES of America, Appellee,**

v.

**Kenneth CLARK and Eric Romandi, Defendants-Appellants.**

**Nos. 1227, 1302, Dockets 79–1142, 79–1175.**

United States Court of Appeals, Second Circuit.

Argued Aug. 13, 1979.

Decided Dec. 28, 1979.

---

Howard D. Stave, Forest Hills, N. Y., for defendant-appellant Clark.

Thomas E. Bowsman, New York City, for defendant-appellant Romandi.

Mark A. Summers, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Mary McGowan Davis, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for the United States of America.

Before MESKILL, Circuit Judge, KEL-LEHER * and HOLDEN,** District Judges.

HOLDEN, District Judge:

Kenneth Clark and Eric Romandi appeal from judgments of conviction in the District Court for the Eastern District of New York, entered by Judge Eugene H. Nickerson on April 2 and April 30, 1979, respectively. The defendant Clark was found guilty of Counts Six and Eight of importing or aiding and abetting the importation of substantial amounts of heroin from Bangkok, Thailand, into the United States in July and September 1977, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 32. Romandi was found guilty of Count Eight for the September importation.[1]

The combined appeals present the restless question of collateral estoppel generated by

---

\* Of the Central District of California, sitting by designation.

\** Of the District of Vermont, sitting by designation.

1.                COUNT SIX

On or about the 14th day of July, 1977, within the Eastern District of New York, at John F. Kennedy International Airport, Jamaica, Queens, New York, the defendants CHARLES PRAETORIUS, LOUIS JUAN, JR., KEN CLARK, GLENSTON PAGE LAWS and others, did knowingly and intentionally import into the United States from Bangkok, Thailand, approximately two kilograms of heroin, a Schedule I narcotic drug controlled substance. (Title 21, United States Code, §§ 952(a) and 960(a)(1) and Title 18, United States Code, § 2).

COUNT EIGHT

On or about the 27th day of September, 1977, within the Eastern District of New York, at John F. Kennedy International Air-

port, Jamaica, Queens, New York, the defendants CHARLES PRAETORIUS, DIANE PRAETORIUS, KEN CLARK, VINCENT AU-LETTA, and ERIC ROMANDI and others, did knowingly and intentionally import into the United States from Bangkok, Thailand, approximately four kilograms of heroin, a Schedule I narcotic drug controlled substance. (Title 21, United States Code, §§ 952(a) and 960(a)(1) and Title 18, United States Code, § 2).

During the second trial Counts Six and Eight were referred to as Count One and Two respectively.

Clark was sentenced to concurrent terms of four years imprisonment, five years special parole, and a $10,000 fine. Romandi was sentenced to three years and three months imprisonment and a special parole term of five years. Both defendants are free on bail pending this appeal.

the prior acquittal of both defendants on October 30, 1978, after a seven week jury trial on an earlier indictment. Count Two of that indictment charged the appellants and other defendants with conspiring to import, to possess with intent to distribute and to distribute substantial amounts of heroin during the life of the conspiracy, in violation of 21 U.S.C. § 846.[2] The main thrust of the appeals is double jeopardy. The principal focus is on the error assigned to the admission into evidence at the second trial of statements of co-conspirators who allegedly participated in the conspiracy charged in Count Two, wherein the appellants were found not guilty at the first trial. Both defendants contend this evidence should have been excluded by the doctrine of collateral estoppel.

The appellant Clark also contends that the Government's summation deprived him of a fair trial. He further claims that the court's supplemental instructions to the jury introduced prejudicial error which required reversal of his conviction.

Romandi's appeal challenges the sufficiency of the evidence to support the offense of importation. He contends that the trial court's restriction of his cross-examination of a government witness was in error. Lastly, he attacks the ruling of the district court which declared a mistrial after the jury failed to reach a verdict in the prior prosecution.

## The First Trial

The appellants were first brought to trial on a ten count indictment which accused Clark and Romandi and sixteen others with participating in an extensive and far-reaching conspiracy which, according to the Government, was organized and principally directed by Charles Praetorius. This defendant was singly charged in Count One of a continuing series of violations of the federal narcotic law in violation of 21 U.S.C. § 848. He was also charged in subsequent counts of substantive offenses with distribution of heroin on two separate occasions. All eighteen of the defendants were charged in Count Two with conspiracy to import, to possess with intent to distribute and to distribute large quantities of heroin during the period from September 1, 1976 through March 1, 1978. Six of the remaining counts charged various defendants with importing or aiding and abetting the import of heroin on successive dates. Count Six charged the appellant Clark and others with the importation of 2 kilograms of heroin on July 14, 1977. Count Eight charged both appellants Clark and Romandi, Charles Praetorius, his wife Diane Praetorius, and Vincent Auletta with importing and aiding and abetting the importation of 4 kilograms of heroin on September 27, 1977.

The trial of thirteen defendants, charged in the original indictment, commenced September 18, 1977, before Judge Nickerson.

2. COUNT TWO

Commencing on or about September 1, 1976, and continuing up to and including the 1st day of March, 1978, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHARLES PRAETORIUS, DIANE PRAETORIUS, FREDERICK PRAETORIUS, KEN CLARK, VINCENT AULETTA, ERIC ROMANDI, LOUIS JUAN, JR., MICHAEL LANZA, GLENSTON PAGE LAWS, KENNETH LEBEL, WILLIAM BURLEY, KATHY PAIGE SARGENT, AUDREY PLUNKETT, GAIL HARRIS, BRENDA HOLLENBACK, JOSEPH SMITH, CARLOTTA RAGAN, and DORIS JACKSON and Daniel Warren, named herein as an unindicted co-conspirator, and others, did knowingly and intentionally combine, conspire, confederate, and agree to violate Sections 841(a)(1),

952(a) and 960(a)(1) of Title 21, United States Code.

1. It was part of said conspiracy that the defendants and others would knowingly and intentionally import into the United States from places outside thereof substantial quantities of heroin, a Schedule I narcotic drug controlled substance.

2. It was further a part of said conspiracy that the defendants and others would knowingly and intentionally distribute and possess with intent to distribute substantial quantities of heroin, a Schedule I narcotic drug controlled substance.

3. It was further a part of said conspiracy that the defendants and others would conceal the existence of the conspiracy and would take steps designed to prevent disclosure of their activities. (Title 21, United States Code, Sections 846 and 963).

The Government's case in the first trial revolved around the testimony of Ralph Abruzzo and Glenston Page Laws, who were leading subordinates in Praetorius' organization and management of the narcotic enterprise.[3]

The combined testimony of Abruzzo and Laws related to a series of six journeys to Bangkok; the first on September 6, 1976, the last on December 19, 1977. The trips corresponded in time and sequence to six successive counts in the indictment. Charles Praetorius was named in all but Count Seven; Laws was named in Six, Seven and Ten. The appellant Clark was charged in Count Six, involving 2 kilograms of heroin in the offense of July 14, 1977, and in Count Eight which specified 4 kilos on September 27, 1977. The appellant Romandi was accused with Clark and three other defendants in Count Eight. Either Laws or Abruzzo was present on both trips; both traveled on the trip of July 1977.

Both Abruzzo and Laws were personally engaged with Charles Praetorius in the planning of the trips, the purchase of heroin in Bangkok and the packing of the substance for the return journeys to the United States. The general pattern and method of operation were substantially similar as to each offense charged in the original indictment, although the persons involved as couriers changed from one expedition to another.

In addition to the testimony of Abruzzo and Laws, the Government's evidence included corroborating testimony of Audrey Plunkett concerning the first trip of September 1977, and Kenneth Pollitt[4] as to the second September and December trips in 1977. Testimony of Jacob Hunt was also received in the first trial of his continuing purchase of heroin from Charles Praetorius from November 1976 through June 1977.

Evidence, by way of airline tickets, passport entries, customs declarations and hotel registrations, was received to document the travels of all defendants and the various co-conspirators between the United States and Bangkok during the time of the conspiracy. In addition, small quantities of heroin, traced to Charles Praetorius and sold by Hunt and Pollitt to undercover agents, were received in evidence.

The case was submitted to the jury on October 19, 1978. The jury's deliberation continued until October 31, when the jury was discharged after reporting they were deadlocked. Before the jury reached that impasse, however, Louis Juan, Charles and Diane Praetorius were found guilty of the conspiracy charge in Count Two. The appellants Clark and Romandi and Doris Jackson were acquitted of this count. Charles Praetorius was also convicted of distributing heroin in June 1977, as charged in Count Five. He was acquitted of the continuing criminal enterprise offense asserted in Count One, the charge of violation of 21 U.S.C. § 848. The jury failed to reach a verdict as to any of the defendants on any of the remaining counts.

### The Second Trial

Before the commencement of the second trial on Counts Six and Eight, Clark and Romandi moved for judgment of acquittal and, in the alternative, for severance. The motions for acquittal were denied. The motions for severance were granted; the case proceeded to the trial of Clark and Romandi

---

3. Four of the defendants, Glenston Page Laws, Kathy Paige Sargent, Brenda Hollenback, and Audrey Plunkett, had pled guilty and were co-operating government witnesses. Joseph Smith was then and remains now a fugitive. (Govt.Br. page 5 n.3).

Before trial Abruzzo entered a plea of guilty to a single count which charged a violation of 21 U.S.C. § 843(b). After testifying in the first and subsequent trials, he received a sentence of two years.

Laws was convicted and sentenced to nine years on an unrelated charge in Great Britain.

He was later deported to the United States and testified at the various trials in the original indictment. He entered a plea and was awaiting sentence when the instant appeal was presented. (Brief of Appellant Clark, p. 19 n.6).

4. Pollitt was prosecuted by the State of New York. He was sentenced to a lifetime period of probation by the Suffolk County Court. He testified under a grant of immunity in the federal prosecution.

on the substantive offenses, separate from the co-defendants charged in Counts Six and Eight.

### Count Six

As in the first trial, the Government's case again centered primarily on the testimony of the cooperating accomplices, Ralph Abruzzo and Glenston Page Laws. The testimony of these witnesses figured prominently in the second trial, but their evidence was, for the most part, confined to the July 2 and September 27, 1977 flights to Bangkok. According to Abruzzo, the chain of events which led to the charge, accusing Clark of participation in the July 1977 journey, began when he and Charles Praetorius met during June to plan the trip. Praetorius informed Abruzzo that he had made arrangements with Clark and Louis Juan to accompany them (Abruzzo and Praetorius) to Bangkok. Clark "was going for Charlie;" Juan "was going for me." According to the scheme, each courier would be paid $25,000 for separately carrying one-half kilogram of heroin.

Abruzzo obtained an airline employee pass. He later met with Praetorius, Clark and Juan at Kennedy Airport on July 6, 1978.[5] They were joined by Laws and informed by Praetorius that Laws would accompany them to Bangkok. All five departed on the same aircraft and arrived sometime between two and three o'clock in the morning of July 8, 1978, Bangkok time. All the members of the group proceeded to register at the Sheraton Bangkok Hotel.

Abruzzo went on to narrate that he and Praetorius occupied the same room in the Sheraton Bangkok. From this base Praetorius contacted Nui, his previously established source in Thailand, and later met him at an agreed upon time and place. At that location Abruzzo and Praetorius ordered two kilograms of heroin for the agreed price of $16,000 and paid $10,000 in advance. A few hours later Nui called Praetorius to arrange for delivery at a jewelry store near the Sheraton. In keeping with Nui's instruction, Praetorius and Abruzzo accepted delivery of the first kilo at the appointed place during the late afternoon of July 8.

Delivery of the second kilo was not accomplished until two days later. In the interval arrangements were made for the appellant Clark to obtain a suit, tailored to one and one-half inches larger than his normal measurement at the waist to accommodate the packing of a plastic belted container of heroin around the courier's midsection. Praetorius received the second kilo. On weighing the substance, it was discovered that the total amount of heroin was eight or nine ounces short of the two kilograms for which they had bargained. Praetorius then called Juan and Clark to his room and gave them the opportunity to depart for the United States immediately with the amounts previously delivered. Before a decision was reached, Praetorius, Abruzzo and Laws met again with Nui and received an amount sufficient to make up the shortage.

On the evening of July 11 the total substance was weighed and packaged in heavy plastic bags designed for use by airlines to transport skis. To flatten and compress the substance in these containers, Praetorius and Clark stomped on the bags and closed the containers with tape. Praetorius strapped one package of 21 ounces around Clark's body by means of stretch elastic tape. The second package, which contained the same amount of heroin, was strapped to Juan. After arranging their air travel, Clark and Juan departed from their hotel around midnight on July 12.

Abruzzo, Praetorius and Laws remained in Bangkok for two more days. The trio departed from Bangkok on July 14, 1977. Laws carried approximately one-half kilogram of heroin taped to his waist; Abruzzo transported three ounces taped to his right leg. On the return journey Praetorius and Abruzzo were "bumped" from their flight

5. Charles Praetorius, Ralph Abruzzo, Vincent Auletta and Kenneth Pollitt and appellant Clark were employed as co-workers by New York Airways at LaGuardia Airport. The appellant Romandi, during the same period, was in the employ of American Airlines at the same terminal.

since they were traveling on airline passes. Laws continued to New York on his assigned flight; Praetorius and Abruzzo followed a day or two later.

Abruzzo testified that two days after he arrived in New York—"Charlie (Praetorius) called me at my house and told me he had just picked up a package from Kenneth Clark near LaGuardia Airport by Travellers Hotel . . .." Praetorius invited Abruzzo to his apartment to deliver his package at that location. From there Abruzzo accompanied Praetorius and his wife Diane to Juan's house at Shirley, Long Island. Juan delivered the package he transported which, according to Abruzzo, was in the same ski bag that was taped to him in Bangkok.

Later, toward the end of July, Praetorius paid Abruzzo $68,000 for the heroin transported by Juan. From this amount $25,000 was deducted to pay Juan. Abruzzo testified that at the time of payment, Praetorius informed him that—"Kennie Clark had already been paid." [6] Both Clark and Juan received an additional amount of $4,000 for each ounce of heroin transported in excess of the half kilogram, for a total of $41,000.

Abruzzo testified that he was present when Clark frequented LaGuardia Airport within a week after his return from Bangkok to inquire of Praetorius concerning the payment he was to receive. On one of these occasions, according to Abruzzo, Clark asked "when Charlie was going back to Bangkok again."

Kenneth Pollitt testified that he was employed by New York Airways at LaGuardia Airport during the summer of 1977. Abruzzo and Praetorius solicited his services as a courier. Pollitt testified that while he was considering involvement, he gave the appellant Clark a ride home after work during the month of July. According to Pollitt, Clark informed him about his trip to Bangkok and what to expect.[7]

*Count Eight*

The offense charged in Count Eight included both appellants Clark and Romandi on the journey to Bangkok of September 27, 1977, and followed a similar pattern. This contingent was composed of Charles Praetorius, his wife Diane, Abruzzo, Kenneth Pollitt, Vincent Auletta and the appellants. As in the July trip, Abruzzo was a principal government witness, along with Kenneth Pollitt.

Charles Praetorius and Abruzzo started preparation for the September trip in August. During the first week in September they met with Clark at LaGuardia. Praetorius then informed Abruzzo that he had solicited Clark, Vincent Auletta, Eric Ro-

6.   A. Before he paid me my 68,000 that he wanted to pay Kennie Clark and Louis Juan first and then pay me, and the day I started to receive my money from Charlie, he told me that Kennie Clark had already been paid.
   Q. Did he tell you how much?
   A. 25,000
   Q. Did he tell you any additional monies were paid to him?
   A. The 25,000 was for the clothes that he brought back, but Charlie paid him for an extra 4 ounces, 4,000 an ounce.
   Q. What was the total?
   A. 41,000.
   Q. And what about Louis Juan?
   A. Same amount, 41,000.

7.   Q. And the conversation was in July of '77?
   A. Yes.
   Q. What did Mr. Clark tell you about the trip that he had been on?
   A. Everything had gone smoothly, he went on Bangkok with Praetorius, Abruzzo,

and a guy named Glen and another passenger agent from New York Airways, Louis Juan, and everything went smoothly. They had a great time over there and he told me about the process of leaving with the heroin taped to the body.
   Q. What did he tell you about that?
   A. He told me that Mr. Juan came to get him so he could take him to Charlie Praetorius' room and told him that he would have it taped on first and then Louis would have it taped on his body. After Mr. Clark had the heroin taped to him, Louis told him it was already on him. Louis had already been prepared. Mr. Clark couldn't tell it by a visual inspection and then Mr. Clark walked around to get used to having the dope on him and then they left at night and they went through a check point that they weren't expected to go through and then they cleared security and had no problems and returned to the states.

mandi and Pollitt to make the trip, along with Praetorius and his wife Diane. Auletta was employed by New York Airways. Pollitt was then on lay-off status with New York Airways. Romandi worked for American Airlines at the same terminal.

Abruzzo testified that a few days before the trip was scheduled, Praetorius told him that Clark was "going on the September trip for himself." He went on to explain that "Clark was going to buy a kilo of heroin and bring it back himself and Charlie Praetorius would sell it for him and pay him for it."

All of the travelers, with exception of Diane Praetorius, were airline employees. Abruzzo, Pollitt and Auletta departed from New York on September 20, 1977. They were joined by the appellant Clark during a stop-over in Tokyo. The appellant Romandi's departure was delayed by ticket complications and he did not leave until the following day. He was instructed by Abruzzo to try to check in at the Indra Regent Hotel; if unsuccessful, he should arrange to meet the others at that hotel at least once every day.

Abruzzo, Pollitt, Auletta and Clark arrived together at Bangkok on September 22, 1977. They all checked in at the Indra Regent, where Charles and Diane had previously registered. Romandi arrived at the same destination on September 24. Later on the day of the 22nd, Praetorius assembled all of the group, except Romandi, at the hotel bar and informed them that he had received delivery of two kilos of heroin from Nui and would obtain delivery of the remaining two kilos in a couple of days.

Shortly after his arrival in Bangkok, Pollitt testified that Romandi expressed apprehension to him whether they could return with the heroin without detection. Both Pollitt and Romandi served in the armed forces in Viet Nam. Pollitt tried to reassure him that "it can't be worse than having been in Nam."

Later that afternoon Charles and Diane Praetorius, with Abruzzo, operating together, proceeded to a designated location in Bangkok where they accepted delivery of

the remaining kilos of heroin from Nui and paid him the balance of the purchase price. An increase in the price of $6,000, demanded by Nui and his associate, required additional funds. Abruzzo advanced $4,000 to Praetorius and Clark gave him $2,000.

The second delivery of heroin was brought to Praetorius' hotel suite. There the bulk of the substance was packed in the same manner employed in the July operation, by use of ski bags which were flattened and taped to Auletta. He departed from the hotel in Bangkok shortly before midnight. Romandi's package was prepared by Clark and Praetorius and taped to the appellant Romandi in the same fashion on the following day, September 25th.

The remaining kilos of heroin were prepared on September 26. Some of this substance was delivered in plastic vials. These containers were emptied, crushed and flushed in the toilet by Praetorius, Abruzzo, Pollitt and Clark. This done, the packages were prepared and taped to Clark and Pollitt. They departed from Bangkok on the same flight.

Abruzzo testified that before Clark and Pollitt left the hotel, he and Praetorius discussed obtaining a finder's fee from Clark "because Clark was carrying for himself." Praetorius informed Abruzzo that he had discussed this with Clark and they agreed he would pay Abruzzo and Praetorius $10,000 each.

Clark made the flight in the tourist section; Pollitt flew first class. During stops in Tehran, Frankfurt and London, Clark and Pollitt remained on the plane until the flight arrived in New York. After they cleared customs, Clark remarked to Pollitt —"Now you are a rich man."

Charles and Diane Praetorius and Abruzzo departed from Bangkok on September 28. A day or two after their arrival in New York Praetorius informed Abruzzo, while they were at work, that he had picked up the package that Clark brought back and would shortly get Auletta's package. He instructed Abruzzo to fix a meeting place to retrieve Pollitt's package when Abruzzo

was ready. Abruzzo testified this was accomplished the following day when he met with Praetorius and Pollitt to receive the delivery. Abruzzo paid Pollitt $20,500 and delivered the package to Praetorius.

According to Abruzzo's testimony, before the final accounts were settled, Clark visited with Praetorius and Abruzzo, while they worked at LaGuardia, to find out when the payments would be made. Praetorius informed Abruzzo and Clark that Auletta and Romandi would be paid first—$50,000 each; then Clark and Abruzzo would be paid. Thereafter Praetorius paid Abruzzo and Clark in cash that was delivered in installments in brown paper bags. Abruzzo received $100,000, which Praetorius left in his locker. Payments by Praetorius were completed on October 11, 1977. In December Abruzzo collected $10,000 at Clark's home as his share of the "finder's fee."

The details of the second September trip were corroborated by entries in passports, customs declarations and hotel registrations.

Neither of the appellants testified at the trial. The defense as to both centered on extensive cross-examinations of the government witnesses, principally Abruzzo, Pollitt and Laws, by attacking their character, credibility and their respective agreements to cooperate by testifying for the prosecution. Inconsistencies in their testimony before the grand jury and at the first trial were explored in depth. Clark presented one character witness. Romandi introduced evidence of his employment records with American Airlines.

### Double Jeopardy Claims

By motions for acquittal presented before the second trial began and after the verdicts of guilty were returned, the appellants jointly challenged the second trial on the ground that their retrial on the substantive counts for importation was barred by their acquittal of the conspiracy charged in Count Two of the first trial. They contended in the trial court and on appeal that the

same evidence presented to establish guilt of importation was introduced to show their participation in the conspiracy and that the acquittal of conspiracy foreclosed introduction of any evidence related to the conspiracy to establish the importation offenses charged against Clark in Count Six and Clark and Romandi in Count Eight.

### Order of Mistrial in First Trial

■ The first double jeopardy claim revisits the first trial to challenge the declaration of a mistrial without consulting defense counsel concerning possible alternatives. The question was implicated, but not explicitly presented in the defendants' motion to dismiss prior to the commencement of the second trial. It is presented again on appeal by the defendant Romandi.

> The trial judge's decision to declare a mistrial when he considers the jury deadlocked is . . . accorded great deference by a reviewing court.

*Arizona v. Washington*, 434 U.S. 497, 510, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978).

The jury commenced its deliberations October 19, 1978. Its verdict was returned as to Charles Praetorius on October 28. Deliberations continued the following day and, after a modified *Allen* charge, the jury returned a verdict as to the defendants Diane Praetorius and Louis Juan. On October 30 the jury found the appellants Clark and Romandi not guilty of the conspiracy charged in Count Two. On the following day the jury notified the court that "it's of no use for the jury to continue further deliberations and a verdict cannot be agreed upon, since we believe the unanimity on verdicts cannot be agreed upon." A motion for mistrial was made on behalf of the defendant Auletta. Counsel for Romandi did not join, but requested an *Allen* charge and renewed his prior motion for acquittal under Fed.R.Cr.P. 29(a). The jury was then discharged without objection on the part of any of the defendants.[8]

---

8. If the appellant had an interest in having his guilt or innocence determined by this particular jury, he failed to make it known to the court.

*See United States v. Beckerman*, 516 F.2d 905, 909 (2d Cir. 1975).

■ After some twelve days of deliberation resulting in a deadlocked jury, the record reveals no basis of support for appellant's claim of abuse of discretion. There were no reasonable alternatives to the ordering of a mistrial. Since the record itself fully supports this, the court was not required to make a finding of "manifest necessity." *Arizona v. Washington, supra,* 434 U.S. at 516, 98 S.Ct. 824; *United States v. Klein,* 582 F.2d 186, 194 (2d Cir. 1978).

### Acquittal of Conspiracy and Collateral Estoppel

Both appellants join in the claim that their acquittal on the conspiracy count bars their conviction on the importation charges.

■ It is firmly established "that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States,* 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946).

The power of Congress to separate the two and to affix to each a different penalty is well established. A conviction for the conspiracy may be had though the substantive offense was completed. And the plea of double jeopardy is no defense to a conviction for both [defenses]. It is only an identity of offenses which is fatal. A conspiracy is a partnership in crime. It has ingredients, as well as implications, distinct from the completion of the unlawful project. (Citations omitted).

*Id.* at 643, 644, 66 S.Ct. at 1182.

■ However, there are some exceptions. Collateral estoppel may constitute a defense to the second prosecution where the doctrine operates to preclude consideration of those issues which were determined at the first trial, although the defenses differ. *Sealfon v. United States,* 322 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948).

■ It is now firmly established that the doctrine of collateral estoppel is embodied in the Fifth Amendment guarantee against double jeopardy. *Ashe v. Swenson,* 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). The majority opinion by Mr. Justice Stewart explains:

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

*Id.* at 443, 90 S.Ct. at 1194.

The rule is more complicated in its application, as the Court went on to point out:

. . . [c]ollateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality. Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to "examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." (Citations and margin references omitted).

*Id.* at 444, 90 S.Ct. at 1194.

■ This court on appeal is summoned to the substantial task of determining what the jury in the first trial decided and how that determination bears on the judgment in the second case. *United States v. Mespoulede,* 597 F.2d 329, 333 (2d Cir. 1979). In this effort the defendant carries the heavy "burden of proving that the fact-finder acquitted him because it resolved in his favor the very issue that he seeks to foreclose from consideration in the second trial." *Id., United States v. Gugliaro,* 501 F.2d 68, 70 (2d Cir. 1974). The burden is particularly onerous where the acquittal in the first trial involves the crime of conspiracy. *United States v. Tramunti,* 500 F.2d 1334, 1346–1349 (2d Cir. 1974).

At the first trial the court instructed the jury on the conspiracy count:

Now, conspiracy is an offense separate from the commission of any offense that may have been committed pursuant to the conspiracy. That is because the formation of a conspiracy, of a partnership in criminal purposes is in and of itself pronounced a crime by the statute. The essence of the charge of conspiracy is an understanding among two or more persons that they will act together to accomplish a common objective which they know is unlawful. The elements of the crime are four:

First, that there be two or more persons involved.

Second, that they wilfully and knowingly conspired or agreed.

Third, that they conspired to commit an act which is unlawful.

Fourth, that one of the members of the conspiracy do an act to effect the object of the conspiracy.

Each of these elements must be proved by the Government beyond a reasonable doubt. Initially, I shall tell you about the first and second elements.

Later in the instructions the court explained:

Now, the indictment charges a single conspiracy involving each one of the defendants. You must determine if the conspiracy charged existed between two or more conspirators. If you find that such a conspiracy existed, to find a defendant guilty, you must find that he or she was a member of the conspiracy charged. If a defendant was not a member of the conspiracy charged, you may not find that defendant guilty even though he or she may have been a member of another conspiracy. But if a defendant was a member of the conspiracy charged, that defendant is guilty even though he or she was also a member of some other conspiracy.[9]

The court went on to explain that "mere association of a defendant with any one of the alleged conspirators is not sufficient to establish that defendant is a co-conspirator."

At the second trial, in submitting the substantive counts of importation charged in Counts Six and Eight, Judge Nickerson instructed the jury:

There are three elements which the government must prove beyond a reasonable doubt:

The first element: The defendant, or someone with whom the defendant was acting in concert, must have committed the act of importing heroin into this country on or about the date alleged.

The second element: The defendant must have known that it was contrary to the law to import heroin into this country; and

Three: The acts of the defendant must have been performed knowingly and willfully.

The court instructed on the aiding and abetting aspect of the importation counts.

Mere presence at the scene of the crime even with knowledge that a crime is being committed is not sufficient to establish that a defendant aided and abetted the crime, unless you find the defendant was a participant and not merely a knowing spectator. Mere association of a defendant with any one of the alleged participants is not sufficient to establish that the defendant is an aider or abettor. To determine whether a defendant aided and abetted the commission of a crime you must ask yourselves whether he participated in or associated himself with the venture as something he wished to bring about and whether he sought to make the venture succeed.

To prevail on their claim of collateral estoppel, the appellants must establish that the first jury could not reasonably have reached its verdict of acquittal on the

---

**9.** This aspect of the court's instruction was in keeping with the evidence that there were several trips to Bangkok that could involve separate conspiracies. *E. g. Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Taylor,* 562 F.2d 1345, 1351 (2d Cir.), *cert. denied,* 431 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977).

charge of conspiracy to import and distribute heroin without also deciding that the defendants were innocent of actual importation. *United States v. Jacobson*, 547 F.2d 21, 23 (2d Cir. 1976), *cert. denied* 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977). If the first jury could have reached its verdict without deciding the defendants' innocence or guilt of actually importing heroin

> the claim of collateral estoppel must fail, since the defendant can prevail only if the issue which he seeks to preclude from consideration was "necessarily" removed in his favor in the prior proceeding.

*United States v. Seijo*, 537 F.2d 694, 697 (2d Cir. 1976); *United States v. Cala*, 521 F.2d 605, 608 (2d Cir. 1975); *United States v. Tramunti, supra*, at 1346.

In pursuing the double inquiry of what the first jury decided and how the judgment of acquittal on the conspiracy count bears on the second trial for importation, we are mindful of the reality that the basis upon which the general verdict was reached usually cannot be demonstrated with certainty. *United States v. Seijo, supra*, 537 F.2d at 697; *United States v. Gugliaro*, 501 F.2d 68, 70 (2d Cir. 1974). As required by *Ashe v. Swenson, supra*, 397 U.S. at 444–45, 90 S.Ct. 1189, we must determine whether a rational jury could have grounded its verdict of acquittal on the conspiracy count on an issue other than importation. To do this, we turn first to the results of the original trial.

An analysis of the verdicts reached in the first trial reveals some of the issues decided. The failure of the jury to agree on several counts against certain defendants enlightens us on the issues that the jury was unable to resolve. By the verdict of acquittal on Count One, which charged Charles Praetorius alone, the jury determined that this accused was not guilty of organizing and operating a continuing criminal enterprise in violation of 21 U.S.C. § 848.

The verdicts of guilty on Count Two established that there was a conspiracy and that the Praetoriuses and Louis Juan were conspirators. The verdict of guilty on Count Five, which charged only Charles Praetorius with the substantive offense of distribution of heroin on July 15, 1977, speaks to the point that the object of the conspiracy was the unlawful distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The verdict of acquittal, as to the defendants Clark, Romandi and Doris Jackson, concluded that these defendants were not members of the conspiracy to distribute in violation of Section 841.

All of the remaining counts, except Count Nine, charged the defendants with the substantive offenses of importation in violation of 21 U.S.C. § 952(a). The jury was unable to agree after extended deliberation on any of these counts. Despite the strength of the circumstantial evidence of importation, the jury's indecision on that issue is understandable in the light of the strenuous attacks on the government's principal witnesses, Laws, Abruzzo and Pollitt, and the extravagant plea bargains that induced their testimony. The fact remains that the verdicts returned by the first jury were indecisive on all aspects of the question of importation. It appears that the first jury could have rationally acquitted the appellants of conspiracy without deciding they were innocent of importing heroin into the United States.

■ We conclude that the appellants have failed to sustain their burden of establishing that their verdict of acquittal on Count Two at the first trial necessarily resolved the substantive offenses charged in Counts Six and Eight within the teaching of *Ashe v. Swenson* and *Mespoulede, supra*. The court holds the United States was not estopped by considerations of double jeopardy from bringing the defendants to trial for unlawful importation.

### Statements of Co-conspirators

■ Both appellants strenuously argue, as they did in the trial court, that the jury's acquittal on the conspiracy count at the first trial foreclosed the admission of the hearsay statements of Laws, Abruzzo and Pollitt at the retrial on substantive counts of importation. In admitting this evidence the trial court relied principally on *United*

*States v. Stanchich*, 550 F.2d 1294 (2d Cir. 1977). The Court of Appeals rejected the contention in *Stanchich* and refers to the course charted in *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied sub nom. Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).

> While the practicalities of a conspiracy trial may require that hearsay be admitted "subject to connection," the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances. If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt.

417 F.2d at 1120.

> [T]he threshold question is whether the Trial Judge could conclude, after all the evidence is in, that the prosecution had established the declarant's and the defendant's participation in the conspiracy "by a fair preponderance of the evidence independent of the hearsay utterances." (Citation omitted).

*United States v. Cafaro*, 455 F.2d 323, 326 (2d Cir.) *cert. denied* 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117 (1972).

There was ample direct and documentary evidence to sustain the trial court's ruling as to Clark's participation with Abruzzo and Laws in the July trip to Bangkok without resort to the hearsay declarations. The evidence was admissible under Federal Rules of Evidence 801(d)(2)(D) and (E).[10]

The same holds true of the trip in which both Clark and Romandi joined in September 1977. Apart from the hearsay declarations of Pollitt and Abruzzo, appellants'

participation was confirmed by their several incriminating admissions and the documentary evidence presented by way of passport and hotel registrations.

The hearsay declarations were not barred by the prior verdicts of their acquittal at the first trial. In *Stanchich, supra*, the trial court directed a verdict on the conspiracy count which charged the defendant with conspiring to commit the substantive crimes of violation of the federal laws against counterfeiting. The appellant argued that the same considerations which caused the trial court to dismiss the conspiracy count rendered the statements by co-conspirators inadmissible on the substantive counts. The opinion by Judge Friendly held the declarations were admissible and went on to explain:

> The argument overlooks the difference in the standards governing the two determinations. . . . A judge may thus consistently find that the evidence (even including admissible hearsay declarations) did not meet the higher test [guilt beyond a reasonable doubt] required for submission of a conspiracy count to a jury, although the independent evidence did meet the lower [preponderance] test required for admission of the declaration.

550 F.2d at 1299.

The fact that the defendants were acquitted on the conspiracy count does not destroy the admissibility of the declarations of co-conspirators on the substantive charge. *See United States v. Kohne*, 358 F.Supp. 1053 (W.D.Pa.1973), *affirmed* 485 F.2d 679, 682, 487 F.2d 1394, 1395, *cert. denied* 417 U.S. 918, 94 S.Ct. 2624, 41 L.Ed.2d 224 (1974) (where there was strong evidence of conspiracy, fact that defendants convicted of substantive gambling charge were acquitted of conspiracy did not retroactively render inadmissible hearsay declarations of

---

**10.** Notes of Committee on Judiciary, Senate Report 93–1277 state:

> While the rule refers to a co-conspirator, it is this committee's understanding that the rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered a co-conspirator for the purposes

of this rule even though no conspiracy has been charged. *United States v. Rinaldi*, 393 F.2d 97, 99 (2d Cir.) *cert. denied* 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969).

co-conspirators). The evidence of statements by co-conspirators or joint venturers concerning the Bangkok trips of July and September 1977 were properly received.

*The Court's Supplemental Instructions*

■ Shortly after the jury received the case for deliberation at mid-afternoon on February 1, 1979, the jury requested the court to repeat its instructions on aiding and abetting. This was done and the jury resumed deliberations until they were excused for the day. The jury continued its deliberations on February 2 for approximately one hour when the court received a request to have certain testimony of the meeting of Pollitt and Clark at Forest Hills read back and a request for the reading of the entire instructions. This was done. After lunch the jury requested the testimony of Ralph Abruzzo and Kenneth Pollitt that related to Romandi. The jury again retired until about four o'clock, when a note was delivered to the court which inquired:

> If a person went somewhere with the intention of participation—is that aiding and abetting? Can we have aiding and abetting expanded upon.

Judge Nickerson drafted proposed supplemental instructions and submitted them to counsel. After considerable discussion and some objection to the court's reference to the evidence, the jury returned to the courtroom.

The court responded to the first question by plainly stating—"The mere going of a person somewhere with the intention of participation would not in and of itself be aiding and abetting." The instructions continued by repeating the prior charge as to the elements of the substantive charge of importation. The essential constituents of aiding and abetting, as explained earlier in the day, were reread. The trial judge concluded his further instructions by explaining:

> Now, what you have to do is apply those instructions to the facts of this case. That means, for example, that if you find beyond a reasonable doubt that a defendant flattened out any of the plastic bags into which the heroin was pack-

aged, or that he broke up the vials in which the heroin was packaged for the purpose of disposing of them, or handed the scissors or the plastic bags to others during the packaging process, or he undressed himself and permitted himself to be taped in the presence of others, thereafter in the presence of others departing the hotel room taped with the heroin. Those acts—and I'm just giving you those examples. If you found them beyond a reasonable doubt to have been performed, would be aiding and abetting. But remember now what I told you that they would have to be done with the requisite intention and knowledge and wilfulness as I have charged it to you.

> All right, I hope that will be helpful to you. Will you go and continue your deliberations please?

The jury again retired and at five o'clock returned verdicts of guilty as to each defendant on both counts. The appellant Clark contends that the court's marshalling of the evidence for the first time was coercive, its effect was unfair to him, and requires reversal. We disagree.

The court responded to the jury's first inquiry with a straightforward answer. The note also inquired: "Can we have aiding and abetting expanded upon[?]." Both requests were granted within permissible bounds of the evidence; it was fair and without demonstrably coercive effect.

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. (Citations omitted).

*Quercia v. United States*, 389 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933) (Hughes, C. J.).

It is clear from the record that the jury wanted something more than the bare recitations of the law which they had previously received on two occasions. There was no comment on the credibility of witnesses, no expression of opinion on the facts. The jury was cautioned that the explanation was given in terms of examples. The examples referred to were derived from the evidence. Of necessity, the reference was to the government's evidence for the defendants presented only evidence of good character. *See United States v. Tourine*, 428 F.2d 865, 869 (2d Cir. 1970). The supplemental instructions went no farther than the need indicated in the jury's request. *E. g. United States v. Wiener*, 534 F.2d 15 (2d Cir. 1976).

### The Government's Summation

As previously indicated, the defense centered on the credibility of the government's witnesses who traveled to Bangkok with the defendant Clark in July and with both defendants in September. The summation of defense counsel followed that line to the effect that the government's case against his client was founded on lies—"little lies, big lies, bigger lies." He argued that the prosecutor had given the jury "nothing but three people who have every motive in the world to lie, who have lied before and will lie again, who are saving their skins."

By way of response in closing argument, the Assistant United States Attorney invited the jury to examine the evidence in the case that came from the witness stand:

And I submit to you, ladies and gentlemen, that that evidence is credible. It is believable. It is supported by the known facts in the case.

Clark's counsel moved for a mistrial on the ground that the prosecutor "has now placed his own credibility before the jury by making that statement." He urges on appeal that the argument constitutes prosecutorial misconduct requiring reversal.

This appeal affords no occasion to belabor the firmly established principle that vigorous prosecution of a criminal offense imposes constraint against "improper suggestions, insinuations, and, especially, assertions of personal knowledge." *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). *United States v. Burse*, 531 F.2d 1151, 1155 (2d Cir. 1976). And, of course, the government's attorney may not interject his own credibility nor vouch for the credibility of witnesses on facts undisclosed in the record. *United States v. Drummond*, 481 F.2d 62, 63 (2d Cir. 1973).

To review the remarks of the attorney representing the United States in the context complained of requires a strained construction not supported by the record. The prosecutor invited the jury's attention to the full evidence; he made no reference to his personal knowledge.

The controlling question is whether the remarks of the prosecutor invaded the accused's right to a fair trial. *E. g. United States v. D'Anna*, 450 F.2d 1201, 1206 (2d Cir. 1971). Instances in *Berger* and *Burse* of improper summation were aggravated by the combination of unfair cross-examination of witnesses and prejudicial conduct that infected the trial generally.

Where a substantial portion of the defense summation is devoted to attacks upon government witnesses, with stress on their cooperation, the prosecutor is entitled to make an appropriate response. *United States v. Wilner*, 523 F.2d 68, 73 (2d Cir. 1975). We find no merit to the claim that the government's closing argument deprived the appellant of a fair trial.

### Proof of Importation of Heroin

The appellant Romandi advances two further points beyond those claimed by the appellant Clark. The first is that his conviction cannot stand because there was no proof that the substance imported was heroin.

Evidence of a chemical analysis of the substance is not essential to a valid

conviction for a narcotic offense. Neither is it necessary that direct evidence be presented to prove the nature of the substance. *United States v. Quesada*, 512 F.2d 1043, 1045 (5th Cir. 1975) *cert. denied*, 423 U.S. 946, 96 S.Ct. 356, 46 L.Ed.2d 277 (1975). *See United States v. Fantuzzi*, 463 F.2d 683, 689 n.7 (2d Cir. 1972).

> Just as with any other component of the crime, the existence of and dealing with narcotics may be proved by circumstantial evidence; there need be no sample placed before the jury, nor need there be testimony by qualified chemists as long as the evidence furnished ground for inferring that the material in question was narcotics.

*United States v. Agueci*, 310 F.2d 817, 828 (2d Cir. 1962) *cert. denied* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

The record here yields abundant circumstantial support for the inference that the substance imported from Bangkok was heroin. It was obtained surreptitiously from a connection in Bangkok. Great effort was made to conceal it. Large amounts of cash were paid to obtain it from the source and to compensate the couriers for transporting it. The witness Pollitt, an experienced user, sampled it and attested the white powder was "high quality heroin." This claim of error is refuted by the record.

### Cross-examination of Abruzzo

At the second trial, as in the first, Romandi's counsel undertook to cross-examine Ralph Abruzzo to establish that on April 25, 1978, the witness testified before the Grand Jury that Romandi had not carried heroin on the September 1977 trip from Bangkok. The transcript of Abruzzo's testimony before the Grand Jury was garbled and confusing.

The witness was first asked how much heroin "Eric DiRomandi" (sic) brought back to the United States on the trip Abruzzo made in September. Abruzzo responded: "A kilo." The next question repeated:

> Q. Did Charles Praetorius, DiRomandi or yourself carry any heroin on this trip?
>
> A. This was the July trip?
>
> Q. This was the September trip.
>
> A. No, they didn't.

On cross-examination of Abruzzo at the second trial:

> Q. Do you recall ever being asked if you have stated to anyone if Charles Praetorius, Romandi or you carried any heroin into this country and that you answered that question "No"? Do you remember anyone asking you that?
>
> A. If anyone asked me, myself, Charlie—
>
> Q. No, if anyone ever asked you and—that question in that manner, do you recall that? [11]

11.   MR. SUMMERS: Could we have that question reread, please?
(Read back)
THE COURT: Why don't you try again, please?
BY MR. BOWSMAN:
Q. It would be that if you recall at the first trial if anyone ever asked you if you ever told anyone that Charlie Praetorius, Romandi or yourself ever carried any heroin back from the September 1977 trip—
MR. SUMMERS: I object to the question and ask for a side bar.
THE COURT: Yes, come to side bar, please.
(Side bar)
THE COURT: I don't understand this.
MR. SUMMERS: Your Honor, what Mr. Bowsman is getting at is cross-examination that he has with Mr. Abruzzo in September. We strenuously objected at the time and I strenuously object again on the basis of the fact there's no good faith basis for that ques-

tion to be asked at the time that it was asked and there's no good faith basis for it to be asked now.
THE COURT: What is the question? I don't even understand the question.
MR. BOWSMAN: I haven't finished the question. I can withdraw it and reask it.
THE COURT: Would you mind telling me what the question is and keeping your voice down at the same time?
MR. BOWSMAN: I'll try to.
I am going to ask him if he was ever asked the question, did Charlie Praetorius, Romandi or yourself ever carry any heroin back from Thailand in September, 1977, and the answer to that question was "No"—
THE COURT: That he wasn't asked that?
MR. BOWSMAN: That he was asked that and the answer that he gave to that question was "No".
THE COURT: That he wasn't asked that?
MR. BOWSMAN: Which I specifically asked him in the first trial, which he answer-

A side bar conference followed. As appears in the margin, the colloquy failed to dispel the confusion that prevailed among counsel, the witness and the court. The question was finally excluded with the observation—"It doesn't make any sense."

The appellant Romandi urged that counsel should have been permitted to cross-examine Abruzzo about his statements to the Grand Jury at the first trial and should have been permitted to submit the Grand Jury minutes into evidence.

We are inclined to agree that the minutes of the Grand Jury on April 25, 1978 might well have been received. Contrary to the appellants' claim, the full transcript was not offered. This is understandable since the document was a double-edged sword; it showed some inconsistency; but it also confirmed that Romandi carried a kilo of heroin into the United States.

■ It is hardly open to question that the unexplained curtailment of cross-examination runs counter to the accused's right of confrontation. *See e. g. Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956

(1968); *Alford v. United States*, 282 U.S. 687, 51 S.Ct. 218, 75 L.Ed. 624 (1931). But the right to cross-examination is not without limits.

The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. It may exercise a reasonable judgment in determining when the subject is exhausted.

282 U.S. at 694, 51 S.Ct. at 220.

■ The discretion vested in the trial court includes reasonable control to make the interrogation and presentation effective for the ascertainment of the truth and to avoid needless consumption of time. Federal Rules of Evidence 611(a). The restrictive ruling challenged here involved both considerations. The question excluded was confusing to court, counsel and the witness alike.

Beyond that, Abruzzo was subjected to cross-examination which is transcribed in 121 pages of the record. The questioning included his interest in testifying for the government; the benefits derived from plea

---

ed and, in fact, if your Honor remembers, it was your Honor that asked him, "Did you say that, is that your answer?" and he said "Yes" to you.

MR. SUMMERS: That was when Mr. Abruzzo was shown the Grand Jury transcript. This is the page of the Grand Jury transcript where that question was asked. I'll call your attention to this question at the bottom of the page (indicating).

As you can see, two lines above that he's clearly answered that Eric Romandi carried a kilo. These are circles of the number of typographical errors on this page. The Court Reporter who took this correct transcript, took his testimony, is now retired, lives in California and he was contacted to get his notes, make the corrections in the page after the last trial. We haven't been able to accomplish that.

I submit to the Court there's no good faith basis based on the number of typographical errors. This is supposed to refer to Diane Praetorius, because that's the testimony and the only evidence he gave. The question is clearly asked two lines above and the answer is a kilo. There's no consistency, no good faith basis for it.

THE COURT: Yes.

MR. BOWSMAN: If your Honor please, the inconsistency is that it's a phonetic spell-

ing of Romandi which occurred in the last trial, as you recall. He was called "Erica Mondi" and everything else under the book except the spelling is exactly the same. If its a typographical here, its a typographical here.

THE COURT: It doesn't make any sense.

MR. BOWSMAN: The fact of the matter is that he is saying here Romandi—

THE COURT: He said one line above that he did.

MR. BOWSMAN: Wouldn't that be an inconsistent statement?

THE COURT: No it makes no sense. He used the word "Eric" there (indicating).

MR. BOWSMAN: He also—would you let him ask—

THE COURT: No, I won't.

MR. STAVE: Judge, I would think the proper question was simply, "Were you asked these questions and did you give these answers to the Grand Jury," period and have him read it. It's more than proper. I think that his right to cross-examine would be restricted.

THE COURT: It's unfair.

(In open court)

MR. SUMMERS: I ask the question be stricken.

THE COURT: Yes.

Just disregard that question, please.

bargaining and instances of claimed inconsistent prior statements in the Grand Jury proceeding and at the first trial. The witness was placed in his proper setting; the weight of his testimony and his credibility were fully tested. No prejudice is shown.

The judgment of the district court as to each defendant is affirmed.