**UNITED STATES of America, Appellee,**

v.

**Velleeta JACKSON,
Defendant-Appellant.**

**No. 56, Docket 85–1102.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 3, 1985.

Decided Dec. 3, 1985.

As Amended on Denial of Rehearing and
Rehearing En Banc Jan. 6, 1986.

Thomas M. O'Brien, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City), for appellant.

Thomas H. Roche, Asst. U.S. Atty., E.D. New York, Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Allyne R. Ross and Jane Simkin Smith, Asst. U.S. Attys., E.D.N.Y., Brooklyn, N.Y.), for appellee.

Before FRIENDLY, PIERCE and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge.

Appellant Velleeta Jackson, Rudolph Whyte and David Phillips were charged in a two-count indictment with conspiring between January and March, 1984, to possess with intent to distribute heroin in violation of 21 U.S.C. § 846, and with possession of heroin with intent to distribute on March 1, 1984, in violation of 21 U.S.C. § 841(a)(1). The jury convicted Whyte on both counts, acquitted Phillips of possession but could not reach a verdict on conspiracy, and acquitted Jackson of conspiracy but could not reach a verdict on possession. A superseding indictment named Phillips alone in the conspiracy count and Jackson alone in the possession count. Jackson and Phillips were retried together on this indictment, and the jury returned verdicts of guilty on both counts.

Jackson's appeal raises two principal issues. One concerns the admission of evidence seized and of statements made during a search of her apartment. The other concerns the admission of evidence similar to that given at her first trial, allegedly in violation of the principle of collateral estoppel as required to be applied in criminal trials, see, e.g., Ashe v. Swenson, 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469 (1970). Although these contentions require thorough discussion, we conclude that they, as well as Jackson's contention that it was error to deny a severance, are ultimately lacking in merit and therefore affirm Jackson's conviction.

The indictment sprang from the arrest of Maxwell Onunkwo and his wife at Atlanta International Airport on February 28, 1984, as they attempted to import heroin into the United States from Nigeria. Onunkwo admitted his guilt and agreed to cooperate with the Government, which promised that his sentence would not exceed five years and that his wife would be sent back to Nigeria.

Onunkwo testified at the first trial that in late January 1984 he bought 80 grams of heroin for $1500 in Nigeria to sell in New York. On arrival at Kennedy Airport later that month he asked a man, to wit, defendant Phillips, who looked Nigerian, to help him make a telephone call to that country, which the man did, paying for the call by use of his own credit card. Onunkwo asked Phillips if he could help him sell the heroin, and Phillips agreed to do so. After a number of unsuccessful attempts to find buyers, Phillips introduced Onunkwo to a woman named Marsha who appeared to have many contacts. After several more unsuccessful tries, Marsha remembered a friend who she thought would pay cash for the heroin. They went to the apartment of appellant Jackson. After giving them some drinks, Jackson said her husband was

not at home but that they would buy the heroin. Five minutes later the "husband," defendant Rudolph Whyte, returned. Whyte tasted the heroin and approved it, indicating his desire to make a substantial purchase. No agreement as to price was reached at the time because Phillips wanted to consult with others about this.

On their next visit to Jackson's apartment to speak to Whyte, the latter took Phillips and Onunkwo into a bedroom and shut the door. After some haggling, they agreed on a price of $200 per gram. Having borrowed a scale from Whyte, Phillips and Onunkwo later measured 55 grams of heroin at their apartment, put it into a cellophane bag, and took it to Whyte. They again went into a bedroom and locked the door. Whyte measured and approved the amount but said he would need a little time to make the necessary sales to pay for it because he had lost his old customers after his former source of supply had dried up, and he needed to let them know that he was back in business. Whyte asked Phillips and Onunkwo to be patient and to accept payment on a daily basis as sales were made.

Phillips and Onunkwo returned the next day. Whyte told Jackson to go into the bedroom and get the money. She entered the bedroom and came back with $1100 which she gave to Whyte who gave it to Phillips. Phillips and Onunkwo came back the next day. Whyte again told Jackson to go into the bedroom and get the money; she returned with $640 which she gave to Phillips. This process was repeated the following day, with Phillips receiving $800 that had been retrieved from the bedroom by Jackson, and again within a few days thereafter, Jackson this time retrieving $300 for Phillips. Several days later, when Phillips and Onunkwo came to the apartment for their fifth payment, Whyte paid them $200 from his pocket.

On the second of these occasions, Onunkwo and Phillips spoke to Jackson immediately upon their arrival, when Whyte was not present. She offered to go to Nigeria with Onunkwo and bring back heroin concealed in her vagina. When Whyte arrived and heard of Jackson's proposal, he said that he did not want her to talk like that or to do anything like that.

On Onunkwo's final visit with Phillips to see Whyte before leaving to return to Nigeria, Whyte advised Onunkwo to come with a woman the next time he smuggled heroin from Nigeria and to use the Atlanta airport rather than Kennedy. With Jackson again retrieving the money from the bedroom, Whyte gave Phillips and Onunkwo another $5000. After paying Phillips a $2000 commission, Onunkwo departed for Nigeria, with Phillips instructing him to return with at least 200 grams of heroin and to use a woman as a courier. Onunkwo carried out these instructions, resulting in the arrest of himself and his wife in Atlanta on February 28, 1984, and in his agreement to cooperate with the Government, as stated at the outset.

Onunkwo traveled to New York with two DEA agents. On March 1, 1984, he made a tape-recorded telephone call informing Whyte of his arrival. Whyte instructed him to come immediately to Jackson's apartment. Onunkwo went to the apartment, wearing a tape-recording device and accompanied by Agent Murray, whom he introduced to Whyte as his brother Ozzie. After Whyte let them in, Onunkwo said he wanted some money, and Whyte said he had $500 for him, fetching it from a bedroom. Onunkwo gave Whyte a parcel of heroin which had been provided by the DEA agents, and Whyte returned to the bedroom to weigh the heroin. Agent Murray opened the apartment door and, in accordance with a prearranged signal from him, other agents entered the apartment with guns drawn and arrested Whyte and placed handcuffs on him.

The agents, who had been informed by Onunkwo that others besides Whyte were involved in the transactions, and that Whyte resided in the apartment with his girlfriend and two children, conducted what the Government calls "a brief security check for any other persons in the apartment." In the course of this security

check, Special Agent Featherly entered the master bedroom with his gun still drawn and discovered Jackson, wearing a bathrobe, on the bed. Featherly yelled "Police" and asked Jackson not to move until he had pulled up a blanket that was covering her to see if she had any weapons in her hands. After Jackson slowly brought up her hands to reveal that there were no weapons, Featherly asked her to get up, and acceded to her request that she be permitted to get her clothes and dress in the bathroom, which the agents first checked without result. When she emerged and inquired what was going on, Featherly told her they were federal narcotics agents and had just arrested Whyte. He then advised her of her *Miranda* rights, using a DEA card, and asked permission to search the apartment, making a full explanation of her right to refuse to consent and to stop the search at any time. The only restriction placed on Jackson's freedom to move about the apartment was that she could not open drawers or reach for anything quickly. Jackson gave permission for the search, said "before you break up the place, let me show you where he keeps it," walked over to a dresser, opened the top drawer, and pointed out a lady's shoe box. This contained glassine envelopes, mixing bowls, a strainer, measuring spoons, mannitol, and two packages of heroin, one of which contained 24.17 grams of heroin with a purity of 50.5% and the other of which contained 1.61 grams of heroin with a purity of 2.7%. The paraphernalia, which Agent Featherly testified to be tools of the narcotics trade, contained traces of heroin and cocaine. When Featherly asked where the heroin had come from, Jackson replied that Onunkwo had brought it, explaining that he had been in the apartment on two other occasions and telling of her offer of her services to bring heroin from Nigeria in her person.

Upon searching further, the agents found the recently delivered package of heroin, containing one gram of heroin with a purity of 61.2% and 127.38 grams of cornstarch, and a scale on the floor of the bedroom. Featherly testified that after the completion of the initial security check, the DEA officers reholstered their guns. Their more thorough search of the apartment with Jackson's consent turned up little else. Featherly also testified that heroin in the quantities and with the degrees of purity found in the shoebox were suitable for sale in some cases to wholesale distributors and in others to heroin users.

When Jackson and Phillips were retried together on the possession and conspiracy counts, respectively, the Government's case was virtually identical to that at the first trial, which we have recounted. The only difference in the evidence at the two trials was that Phillips chose to testify in his own behalf at the second trial. In both trials, Jackson's principal strategy was a heavy attack on the credibility of Onunkwo, focusing on his cooperation agreement with the Government, inconsistent statements he had made to a grand jury, lapses in memory in his testimony, and his physically impaired hearing as a result of shell-shock during the Nigerian Civil War, and an emphasis on Jackson's limited role in the events to which Onunkwo had testified.

### The Fourth Amendment Issues

Jackson raises two distinct Fourth Amendment issues. The first is that the entry into her bedroom was an unauthorized search, the illegality of which tainted everything that was found as a result. The second is that even if the entry into her bedroom was legal, her consent to the search was the result of an unlawful arrest and that the product of the search must be suppressed pursuant to *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983).

■ Jackson's first argument runs counter to a line of authority in this circuit, stemming from *United States v. Christophe*, 470 F.2d 865, 869 (2 Cir.1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973). That case held that after a suspect is lawfully arrested in his home, even though without a warrant, as Whyte was here, the arresting agents are

"entitled to conduct a cursory examination of the premises to see if anyone else was present who might threaten their safety or destroy evidence." In *United States v. Agapito*, 620 F.2d 324, 335 (2 Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980), after acknowledging the general rule that a warrantless search of a dwelling "is constitutionally prohibited, even though there may be probable cause for the search," citing *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1971, 26 L.Ed.2d 409 (1970), and *Chimel v. California*, 395 U.S. 752, 760–62, 89 S.Ct. 2034, 2038–39, 23 L.Ed.2d 685 (1969), the court reiterated, citing *Christophe*, that "[u]nder certain circumstances, however, immediately following an arrest, law enforcement officers without a warrant may be permitted to conduct a security check—a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers," although holding that the check there involved did not qualify for the exception. We repeated this in *United States v. Gomez*, 633 F.2d 999, 1008 (2 Cir.1980), *cert. denied*, 450 U.S. 994, 101 S.Ct. 1695, 68 L.Ed.2d 194 (1981), adding that objects coming into plain view during the check could properly be seized. *United States v. Fulton*, 549 F.2d 1325, 1327 (9 Cir.1977), is to the same effect.

Although it is implicit in *United States v. Agapito, supra*, 620 F.2d at 335–37, that the officers must have a reasonable belief that a third person might be on the premises, there was ample basis for such a belief here. Other circuits have imposed a further requirement of knowledge that other persons in the house would be dangerous. *See, e.g., United States v. Hatcher*, 680 F.2d 438, 444 (6 Cir.1982) (over the dissenting opinion of Judge Kennedy, *id.* at 450–51, arguing that the court was putting too heavy a burden on the Government to show knowledge of dangerousness in justifying a sweep); *United States v. Kolodziej*, 706 F.2d 590, 596–97 (5 Cir.1983); *see also United States v. Gardner*, 627 F.2d 906, 909–10 & n. 3 (9 Cir.1980), and cases cited; Kelder & Statman, *The Protective Sweep*

*Doctrine*, 30 Syracuse L.Rev. 973, 1006–35 (1979). Here there was no evidence that the officers had reason to believe that Jackson ·or other occupants of her apartment were armed, other than their general knowledge that the homes of drug dealers are often provided with arms if only to protect them in the possession of drugs. *Cf. United States v. Viserto*, 596 F.2d 531, 537 (2 Cir.) (stating, in the course of holding evidence that defendant supplied guns to others admissible to link him with the conspiracy to distribute narcotics, that "[w]e have recognized that handguns are tools of the narcotic trade"), *cert. denied*, 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979). *But see United States v. Hatcher, supra*, 680 F.2d at 444 (error for district judge to uphold protective sweep subsequent to arrest for narcotics offense simply on basis that "the subject of drugs is a dangerous one"). However all this may be, the officers here had abundant reason to believe that Jackson, if left wholly to her own devices, would attempt to destroy evidence—including the parcel of heroin that had just been placed in her bedroom, and it is settled in this circuit that protection of evidence from destruction by third persons is a legitimate justification for a security sweep. *See United States v. Vasquez*, 638 F.2d 507, 529–31 (2 Cir.1980), *cert. denied*, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981); *see also United States v. Diaz*, 577 F.2d 821, 824 (2 Cir.1978) (although arrest of defendant did not justify wider search of apartment than was undertaken, the officers were not required to leave immediately with the attendant risk that defendant's roommate would remove or destroy evidence of the crime). In the absence of contrary Supreme Court authority, we adhere to our previous rulings and uphold the entry into Jackson's bedroom.

■ With respect to Jackson's claim of unlawful arrest, the Government does not contend that it had probable cause to arrest her before she consented to the search; it contends rather that the actions of its agents did not rise to the level of a de facto arrest. Jackson can hardly assert that the

agents' permitting her to go to the bathroom and dress constituted an arrest. When she came out of the bathroom, the agents advised her of her *Miranda* rights, asked her a few questions about the occupants of the apartment and Jackson's relationship with Whyte, and then requested her consent to a search of the apartment. The agents were entitled to remain for a short period reasonably necessary to solicit her consent to a search. *See United States v. Diaz, supra,* 577 F.2d at 824. The agents replaced their guns in their holsters as soon as they had secured the apartment; Jackson does not claim that any threats of force were made toward her. And while much is sought to be made of the fact that the agents told her they had arrested Whyte and that she saw him handcuffed, it is more significant that they never threatened to arrest or handcuff her and the only limitations on her freedom to move about were the warnings not to open drawers or reach for anything quickly. We also do not see the significance in the giving of the *Miranda* warnings that Jackson does; while these must be given before post-arrest interrogation begins, we see nothing wrong in agents giving these at an earlier point, if only out of abundant caution in order to avoid a claim that they were given too late. Since such warnings thus may be given before arrest, a suspect is not entitled to an inference that a reading of them implies that an arrest has been made.

The case is distinguishable from *United States v. Sanchez-Jaramillo,* 637 F.2d 1094, 1098–99 (7 Cir.), *cert. denied,* 449 U.S. 862, 101 S.Ct. 166, 66 L.Ed.2d 79 (1980), on which Jackson relies, and which does not bind us in any event. In that case, after the arrest of the defendant Sanchez, and his consent to a search of his home, the agents discovered the defendant Cruz lying naked on a bed in one of the rooms of the apartment. The agents, having no probable cause to believe Cruz had engaged in any criminal activity, pointed a flashlight in Cruz's face, asked his name, and read him his *Miranda* rights. After granting him permission to put on his pants, the agents told him to go into the living room and sit next to Mr. and Mrs. Sanchez, specifically telling him not to move while the agents conducted their search of the apartment. The agents then requested that Cruz open two suitcases containing incriminating material which had been found in his room. Under these circumstances, the Seventh Circuit held that the detention and questioning of Cruz was more intrusive than was reasonably justified under the rationale of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), and that "[t]he agents' actions, regardless of whether they are technically characterized as an arrest, should have been judged by the traditional probable cause standard." 637 F.2d at 1090 (citing *Dunaway v. New York,* 442 U.S. 200, 213–14, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979)). By contrast, the actions of the agents in Jackson's bedroom were not unreasonable or more intrusive than was justified by the circumstances. Most of the delay between the agents' first entry into Jackson's bedroom and her consent to the search was taken up by her dressing in the bathroom. Moreover, unlike the defendant Cruz in *Sanchez-Jaramillo,* Jackson was not restricted to any particular part of the apartment. And although Jackson's consent was given in response to the agents' request, it was she who volunteered the information about the location of the heroin and the agents had made it perfectly clear that Jackson had the right to withhold her consent.

We thus hold that Jackson was not illegally arrested and that her consent to search was voluntarily given.

*Collateral Estoppel*

In *United States v. Kramer,* 289 F.2d 909, 913 (2 Cir.1961), seemingly this court's first extended discussion of the application of collateral estoppel in criminal cases, we said:

Application of the principle inevitably has two phases. The first is to determine what the first judgment determined, a process in which ... the court must look not simply to the pleadings but

to the record in the prior trial. The second is to examine how that determination bears on the second case.

This approach was later endorsed in *Ashe v. Swenson*, 397 U.S. 436, 443–45, 90 S.Ct. 1189, 1194–95, 25 L.Ed.2d 469 (1970), and we have not deviated from it, *see United States v. Mespoulede*, 597 F.2d 329, 332–33 (2 Cir.1979); *United States v. Clark*, 613 F.2d 391, 400 (2 Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980). Description of the facts in these and other cases will aid in coming to a correct conclusion here.

*Kramer* was in a sense the converse of this case. There Kramer and others had been indicted in the District of Connecticut for substantive offenses arising out of the burglary of two Connecticut post offices. The jury was charged that it might convict Kramer as an aider and abetter even though he did not personally do every act concerning the offenses charged. 289 F.2d at 914. The jury acquitted. A subsequent indictment in the Eastern District of New York charged Kramer and others with conspiring to break and enter the two post offices, with conspiring to receive property stolen therefrom, and with the substantive offense of receiving property known to have been stolen from the post offices. The judge in the Eastern District trial allowed the Government to offer substantially the same evidence as in the Connecticut trial. Because Kramer's defense in the first trial consisted solely of a claim of alibi, and the Government's case against Kramer placed him at the center of the alleged criminal activity, we held, *id.* at 915, that the verdict settled

> that Kramer did not burglarize the Wilton and Orange post offices on the nights of May 26 and June 14 and was not responsible for whoever did.

Accordingly, the Government should have been "prohibited from offering evidence which, if believed, would necessarily lead to the conclusion that Kramer participated in the burglaries, either directly or as an aider or abetter." *Id.* at 918–19. We went on to hold, *id.* at 919, that since the testimony at the Connecticut trial, "if believed, showed that Kramer ... was one of the principal guiding forces" in the burglary conspiracies, verdicts of acquittal should be entered on those counts. *Per contra* a new trial might be had on the conspiracy and substantive counts relating to receiving, with any evidence pointing directly to Kramer's guilt of the burglaries as a principal or aider and abetter excluded. This was because the Connecticut trials had not necessarily established Kramer's innocence of these crimes, and the Government had presented sufficient evidence of the conspiracy to receive and of the reception, other than evidence that would show Kramer's guilt of the burglaries, to get to a jury.[1]

*Mespoulede, supra*, 597 F.2d 329, was essentially a replay of *Kramer*. After trial on a two-count indictment, the jury had acquitted Mespoulede on a count charging him with possessing cocaine with intent to distribute; it failed to agree on a verdict on the other count charging him with conspiracy to distribute cocaine. We held that at the retrial of the conspiracy count, the prosecution should have been precluded from introducing the evidence with respect to possession which the jury had necessarily rejected at the first trial—even though the Government was not required to establish possession in order to prove a conspiracy to distribute. *Id.* at 334–35.

*United States v. Clark, supra*, 613 F.2d 391, reveals the other side of the coin.

---

**1.** The *Kramer* opinion thus illustrates the principle well outlined by Judge Roney that

> collateral estoppel may operate in two distinct ways. First, it may completely bar a subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element to the conviction the Government now seeks. An example is when an earlier acquittal necessarily places the de-

fendant away from the scene of the crime. . . . Second, although the subsequent prosecution may proceed, collateral estoppel operates to bar the introduction or argumentation of certain facts necessarily established in a prior proceeding.

*United States v. Lee*, 622 F.2d 787, 790 (5 Cir. 1980) (citations omitted), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981).

There, as here, the appellants had first been acquitted on a conspiracy charge, to wit, of conspiring to import heroin, but the jury failed to agree on substantive counts charging them with illegal importation. The Government's case against the appellants consisted principally of the testimony of other parties in the alleged conspiracy. They described appellants' role in certain trips abroad to act as couriers for bringing heroin into the United States, although the trial involved other defendants who played a much more significant role in the overall conspiracy, and the testimony of the Government's witnesses attributed the planning and organizing of the trips to these other defendants. As with the defendant Whyte here, the defendant who was portrayed as the leader of the conspiracy, Praetorius, was convicted on the conspiracy charge. In the retrial of the appellants on the substantive counts, the Government presented virtually the same evidence against them that had been introduced at the first trial. After reviewing the record and verdicts in the first trial, and after quoting the charge on the elements of conspiracy at that trial, which stressed the essential element of agreement, and the charge on the substantive crime at the second trial, this court concluded that "the first jury could have rationally acquitted the appellants of conspiracy without deciding they were innocent of importing heroin into the United States." *Id.* at 402.

On its face Jackson's appeal would seem to be governed by *Clark* rather than by *Kramer* and *Mespoulede.* The testimony at the first trial left much room for doubt whether Jackson had entered into an agreement with others to distribute heroin. Jackson had nothing to do with the importation of the heroin which figured in the transactions of late January and early February, and all of the decisions concerning its purchase and resale were made by Whyte. Her later role with respect to this heroin could well have been viewed by the jury as ministerial rather than conspiratorial. Although she offered to play the role of a courier in the second importation,

Whyte vetoed this and the offer was not accepted. On the other hand, the jury at the second trial could rationally have found, without eroding the first jury's acquittal on the conspiracy count, that Jackson either had possession of heroin with intent to distribute or aided and abetted Whyte in his possession with such intent. We have recently pointed out that the offenses of conspiring and of aiding and abetting, while closely allied, are distinct. *United States v. Tyler,* 758 F.2d 66, 70–71 (2 Cir.1985). When the first trial results in an acquittal on the conspiracy charge, generally there is no way of telling whether the basis for acquittal was disbelief of some portion of the Government's evidence, and what that portion might have been, or whether the jury simply regarded the evidence as insufficient to prove an agreement, especially when, as here and in *Clark,* the Government's evidence did not place the retried defendant at the center of the conspiracy. *See also United States v. Tramunti,* 500 F.2d 1334, 1346–47 (2 Cir.) (prior acquittal of conspiracy does not foreclose issue of truth of defendant's testimony at that trial that he did not meet with alleged co-conspirators for purposes of subsequent perjury trial: "it may very well have been that a jury could disbelieve [defendant's] denial ... and still acquit him because of the abysmal failure of the Government's proof that this isolated emergence of [defendant] in an intricate scheme established the specific intent necessary for conviction of a conspiracy charge"), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *United States v. Gugliaro,* 501 F.2d 68, 70–72 (2 Cir.1974) (similar). There can thus be no general principle that, after acquittal on a conspiracy count, the Government may not retry a defendant on a related substantive count.

None of this is meant to suggest that an acquittal of conspiracy can never operate as collateral estoppel on a substantive count. *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948), establishes that under some circumstances it can. However, *Sealfon* was a very differ-

ent case from this one. Sealfon had been tried and acquitted on an indictment charging him with conspiracy with the principal defendant, Greenberg, to defraud the Government by presenting false invoices and making false representations to a rationing board that sales of Greenberg's vanilla syrup had been made to the Brooklyn Navy Yard and to defense plants which were exempt from wartime rationing. The only proof linking Sealfon with the crime was a letter by him to Greenberg saying "at the present time some of our syrups are being sold at the Brooklyn Navy Yard" and various defense plants. After the acquittal on the conspiracy charge Sealfon was tried and convicted of aiding and abetting the substantive crime, to which Greenberg pleaded guilty as he had to the conspiracy indictment. After reviewing the instruction and the evidence at both trials, the Court concluded that Sealfon could be convicted of either the conspiracy or the substantive offense only on proof that he had written the letter pursuant to an agreement with Greenberg; hence the second trial was an impermissible "second attempt to prove the agreement which at each trial was crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be non-existent." *Id.* at 580, 68 S.Ct. at 240.

■ Here, to the contrary, the testimony at the first trial left it open to the jury to find either that Jackson had entered into an agreement for the distribution of heroin between January and March, 1984, or that she possessed or aided and abetted the possession of heroin with an intent to distribute on March 1, 1984. While the evidence of an agreement was sufficient for the jury to convict Jackson on the conspiracy count, a juror could rationally refuse to do this and yet be convinced of Jackson's guilt of the substantive count. The judge included in his charge concerning the definition of conspiracy that it "is a kind of partnership in criminal purposes, in which each member becomes an agent of every other member." Although the judge charged that "a defendant may be convicted as a conspirator even though he or she

may have played only a minor part in the conspiracy," and that it need only be shown that there was "some knowing participation, however, however small, by a defendant, in furtherance of the purposes of the conspiracy," the judge also instructed that "[m]ere association may not in and of itself be the basis for an inference of conspiracy," that "[m]ere presence at the scene of a crime, even if coupled with knowledge that a crime is being committed, is in and of itself insufficient to establish the commission of a crime," that "a person who has knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator," and that "the evidence ... must show ... that the defendant or other person who has claimed to have been a member [of the conspiracy] willfully participated in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy." Under this portion of the charge, and in light of Jackson's relatively peripheral role in the conspiracy as portrayed in the Government's case, a rational jury could have concluded that the Government had failed to prove beyond a reasonable doubt that Jackson was guilty of "willful[ ] participat[ion]" in a conspiracy, though it could not decide that the Government had also failed to establish beyond a reasonable doubt that she was guilty of aiding and abetting.

■ Not really challenging the Government's right to bring her to trial again on the substantive count, Jackson claims that the court should have excluded all of Onunkwo's testimony since, as she would have it, the fact that his testimony, if believed, would have compelled the jury to convict of conspiracy shows that the jury necessarily discredited this in acquitting her of that crime. The conclusion does not follow, for much the same reasons already discussed. There are indeed cases applying a principle that would forbid the Government's use, at a second trial, of a witness who has necessarily been found to

be incredible at the first trial.[2] But we see no basis for invoking that principle here. A juror at the first trial could have believed all or certainly almost all of Onunkwo's testimony with respect to evidentiary facts without being convinced beyond a reasonable doubt of the ultimate fact that Jackson had entered into an agreement to become a conspirator, as distinguished from forwarding the ambition of her cohabitant, Whyte. The Government was entitled to use the same testimony in order to establish another ultimate fact—aiding and abetting—at a second trial. *See United States v. Praetorius*, 462 F.Supp. 924, 926–27 (E.D.N.Y.1978), *aff'd mem.*, No. 79–1022 (2 Cir. May 15, 1979), *cert. denied*, 444 U.S. 869, 100 S.Ct. 144, 62 L.Ed.2d 94 (1979). The only portions of Onunkwo's testimony which Jackson was entitled to have excluded at the second trial were those which bore solely on her intention to be a conspirator rather than merely an aider or abetter, but Jackson made no effort to identify them.[3] Indeed, even a claim for the exclusion of all of Onunkwo's testimony at the

first trial that was relevant solely to conspiracy would be too broad because, even if the jury at the first trial might have disbelieved some of his testimony in arriving at its decision to acquit on the conspiracy count (and this is not a necessary conclusion, as discussed above), it certainly was not necessary to acquittal that the jury disbelieve *all* of Onunkwo's testimony. As the judge instructed the jury in that trial, jurors are not required to reject or accept any particular witness's testimony *in toto*. When, as here, the witness's testimony in a first trial was extensive and covered a large number of events, it usually is nigh impossible to show that the jury disbelieved all of his testimony. A defendant who relies on collateral estoppel for the exclusion of such a witness's testimony must generally single out the portions which must have been disbelieved in order to warrant an acquittal; Jackson did not, and could not, do this. *See United States v. Kalish*, 690 F.2d 1144, 1155 (5 Cir.1982), *cert. denied*, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983).

**2.** *See, e.g., United States v. Mock*, 604 F.2d 341 (5 Cir.1979), on which appellant heavily relies. Mock had been convicted of violating 26 U.S.C. §§ 7201 and 7203 for failing to file an income tax return and for attempting to conceal taxable income in 1972. The source of income principally relied upon by the Government was income derived from the importation of marijuana. Mock had previously been indicted for having conspired to do this; after the jury had disagreed the judge entered a judgment of acquittal under F.R.Crim.P. 29 on the expressed basis that the Government's primary witness, one Kilgore, was "so unbelievable as to be insubstantial." 604 F.2d at 343. The court held it was error to allow the Government to introduce this testimony at the trial of the tax indictment. In doing this it pointed out, *id.* at 345, that if Kilgore was believed,

> [t]his was not a case where an acquittal on a conspiracy charge can reasonably be understood to mean that the jury had no basis to find the essential element of agreement.

Hence the acquittal must have rested on the jury's refusal to believe him. Beyond this, in *Mock* there was an express finding by the judge in the first trial that the testimony of the Government's key witness was too incredible to be assigned any probative value.

**3.** Jackson's counsel only asked generally before the second trial for the exclusion of "any reference, either testimony or in the form of physical evidence to Ms. Jackson's participation in a con-

spiracy," and more specifically for the exclusion of incriminating statements concerning her offer to be a courier and her participation with Whyte in the heroin transactions that were made in the presence of the DEA agents at the time of Whyte's arrest. The judge did not err in overruling these objections on the grounds that this testimony was still relevant to Jackson's knowledge and intent for the purposes of the substantive offense, the issue upon which it appeared the defense would be focused, and that the probative value of the evidence outweighed its prejudicial effect. The only other relevant objections made during Onunkwo's testimony were to certain hearsay statements which the judge allowed, apparently under the co-conspirator exception to the hearsay rule, F.R.E. 801(d)(2)(E), which, because of the difference in standards, would be fully available even though Jackson had been acquitted of participation in the conspiracy. *See United States v. Stanchich*, 550 F.2d 1294, 1299 & n. 4 (2 Cir.1977). Moreover, any objection based on error in the admission of such testimony was waived by defense counsel's approval of the trial judge's charge to the jury without mentioning these objections or insisting on curative instructions. This also is true with respect to appellant's contention on appeal that the judge failed to charge the jury not to consider against Jackson evidence admitted against Phillips alone.

Jackson argues also that it was an abuse of discretion not to sever her prosecution from Phillips' at the second trial under F.R.Crim.P. 14. We have stated that it is in the interests of judicial economy to try defendants together where the crimes charged arose out of the same acts and were established by substantially the same evidence, *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1144 (2 Cir.), *cert. denied,* 439 U.S. 913, 99 S.Ct. 285, 58 L.Ed.2d 260 (1978), and that this court is "reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice," *United States v. Stirling,* 571 F.2d 708, 733 (2 Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). We have carefully examined Jackson's contention of substantial prejudice and find that she has not sustained the heavy burden of showing any abuse of discretion on the part of the district court.

Judgment affirmed.