UNITED STATES of America

v.

Jorge NENADICH, Defendant.

No. 87 Cr. 1015 (PKL).

United States District Court,
S.D. New York.

June 24, 1988.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Elliot R. Peters, Asst. U.S. Atty., New York City, of counsel), for the U.S.

Sam A. Schmidt, New York City, for defendant.

## OPINION AND ORDER

LEISURE, District Judge:

A multi-count Indictment was filed in this case on January 7, 1988. Defendant Jorge Nenadich and co-defendant Carmen Santiago were charged in Count One of the Indictment with conspiring to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 812 and 841. Count Two of the Indictment charged Carmen Santiago with distribution of cocaine on October 14, 1987. Nenadich was not named in Count Two. Count Three of the Indictment charged both defendants with possessing cocaine

base (commonly known as "crack"), with intent to distribute, on December 16, 1987. Count Four of the Indictment charged both defendants with use of a firearm during and in relation to a drug trafficking crime.

A joint trial of defendants Santiago and Nenadich began on March 28, 1988. At the close of the government's case, Count Four of the Indictment, containing the firearms charge, was dismissed by the Court pursuant to Fed.R.Cr.P. 29. On April 4, 1988, the jury returned a verdict convicting Carmen Santiago on all of the remaining counts.

At the same time, the jury acquitted Jorge Nenadich of the substantive charges against him in Count Three of the Indictment. However, the jury was unable to reach a verdict as to Nenadich on the conspiracy charges contained in Count One. With the consent of both the government and the defendant, the Court therefore declared a mistrial as to Nenadich on Count One.

The government has indicated its present intent to retry Nenadich on the conspiracy charges contained in Count One of the Indictment. Jorge Nenadich has brought the instant motion to preclude the government from introducing, at a retrial on the conspiracy count, evidence of his alleged possession of cocaine base on December 16, 1987. Nenadich has also moved to prohibit the Government from reprosecuting the remaining conspiracy count unless the government proffers new evidence, independent of the alleged December 16, 1987 possession, to support the conspiracy charges.

## DISCUSSION

■ Where a mistrial is declared because of the failure of a jury to reach a verdict, the Double Jeopardy Clause poses no *per se* bar to retrial of the defendant. *See United States v. Ustica*, 847 F.2d 42 at 48 (2d Cir.1988). However, because the fifth amendment guarantee against double jeopardy incorporates the doctrine of collateral estoppel, the Double Jeopardy Clause will, in certain circumstances, bar the introduction of particular *evidence* at a second

trial. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Specifically, collateral estoppel means "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. at 1194. In the criminal context, "the Government is precluded from relitigating an issue decided in defendant's favor by a valid final judgment." *United States v. Mespoulede*, 597 F.2d 329, 332 (2d Cir.1979).

In this Circuit, a two step inquiry, first enunciated by Judge Friendly, is used to determine whether collateral estoppel applies in a particular criminal case. "The first is to determine what the first judgment determined, a process in which ... the court must look not simply to the pleadings but to the record in the prior trial. The second is to examine how that determination bears on the second case." *United States v. Kramer*, 289 F.2d 909, 913 (2d Cir.1961) (Friendly, J.). *See also United States v. Mespoulede*, 597 F.2d at 333. It is the defendant's burden "[to prove] that the fact-finder acquitted him [at the first trial] because it resolved in his favor the very issue that he seeks to foreclose from consideration in the second trial." *Mespoulede*, 597 F.2d at 333. However, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Ashe v. Swenson*, 397 U.S. at 444, 90 S.Ct. at 1194. Nor is the defendant required "to postulate 'hypertechnical and unrealistic' grounds on which the jury [at the first trial] could conceivably have rested its conclusions." *Mespoulede*, 597 F.2d at 333 (citations omitted).

In *Mespoulede*, after trial on a two-count indictment, the jury acquitted the defendant Mespoulede on one count, which charged him with the substantive crime of possessing cocaine with intent to distribute. The jury could not agree on a verdict as to the other count, which charged Mespoulede with membership in a conspiracy to distribute cocaine, and a mistrial was declared as

to that count. The Court of Appeals concluded that at the retrial of the conspiracy count, the prosecution should have been precluded from introducing any evidence with respect to the substantive possession which the jury had rejected at the first trial.

Specifically, at Mespoulede's first trial, the government argued that Mespoulede had cut and packaged cocaine on January 31, 1978. The trial court had instructed the jury that the government was required to prove four elements to convict Mespoulede of possession of cocaine with intent to distribute: (1) that the substance involved was indeed cocaine, (2) that Mespoulede possessed it, (3) that he did so knowingly, and (4) that he did so with an intent to distribute it. Mespoulede agreed to stipulate that the substance found was cocaine, and that he had knowledge it was cocaine. Mespoulede argued, however, that he was merely a knowing spectator, uninvolved in the drug transaction charged in the relevant count of the indictment. In concluding that no evidence concerning the possession of cocaine on January 31 should have been introduced at the retrial on the conspiracy count, then Chief Judge Kaufman explained:

> Here, Mespoulede is once again faced with criminal sanctions that, realistically, may be imposed in large part because the second jury is persuaded that he possessed cocaine on January 31.

> To be sure, he is now being tried for conspiracy, but the evidence of possession was introduced to persuade the second jury of the same fact already litigated and resolved in Mespoulede's favor—that he was cutting and packaging cocaine on January 31. Although we can never know how much weight the evidence of possession on January 31 carried with the second jury, from the standpoint of the double jeopardy clause the key fact is that Mespoulede was subjected to a second risk of conviction for his actions on January 31. No less than in the first trial, Mespoulede had to con-

front an assertion that he possessed cocaine on that date.

\*    \*    \*    \*    \*    \*

[W]here one jury has "necessarily determined" that the defendant was innocent of participation in one deal, that transaction is out of bounds on retrial.

*Mespoulede*, 597 F.2d at 335–36 (citations omitted). *See also United States v. Jackson*, 778 F.2d 933, 940 (2d Cir.1985) (Friendly, J.), *cert. denied*, 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986).

The facts relevant to collateral estoppel and double jeopardy in the present case parallel those in *Mespoulede*. In the present case, Jorge Nenadich was charged with possession with intent to distribute, on December 16, 1987, of approximately 50 grams of cocaine base. At trial, the government presented the testimony of two Drug Enforcement Agency agents who had arrested Nenadich on December 16. The agents testified that when they arrived, they found Nenadich near the bathroom. *See, e.g.*, Tr. 113, 212, 332. Special Agent Anthony Faretta told the jury that he heard the toilet in the bathroom running, and Agent Philip Devlin testified that he noticed a white colored film on the water of the toilet bowl. *See, e.g.*, Tr. 216, 374. The agents also testified that they believed Nenadich had disposed of cocaine base in other parts of the bathroom. *See, e.g.*, Tr. 346–47. In one of the bedrooms in the apartment, the agents found a number of personal documents and several items of clothing belonging to Nenadich. In that bedroom, the agents also seized a quantity of cocaine base inside a brown paper bag, a Marlboro cigarette box containing small vials of crack, a scale, a beeper, a two-way radio, a police scanner, small bags suitable for packaging narcotics, and empty vials commonly used to package cocaine base for sale. *See, e.g.*, Tr. 164–54, 199. The government sought to use this evidence, in conjunction with Nenadich's alleged disposal of cocaine base in the bathroom, to show that Nenadich, either alone or aiding the co-defendant, possessed cocaine base on December 16 with intent to distribute. The government stressed that the amount of

cocaine base found, and the drug paraphernalia in the apartment, reflected an intent to distribute the drugs. *See, e.g.*, Tr. 494–98. The government never suggested, nor did the evidence itself suggest, that the jury consider Nenadich's alleged disposal of cocaine base separately from the other evidence found in the apartment on December 16. Indeed, the prosecutor, in summation, specifically suggested to the jury that "it is clear Jorgie Nenadich was disposing of that crack on the night in question. And he shouldn't benefit in any way from the fact that he was flushing it, shoving it down the vent, and getting rid of the big stash. Because you know, Ladies and Gentlemen, this was a significant drug conspiracy, this was a significant drug operation, they were distributing from different locations, they were taking it to Puerto Rico." Tr. 502–03.

The Court instructed the jury that in order to prove Count III's possession with intent to distribute charge against defendant Nenadich, the government had to establish, beyond a reasonable doubt, that on or about December 16, 1987, in the Southern District of New York, Nenadich possessed cocaine base; that Nenadich knew that he possessed narcotic drugs; and that

Nenadich intended to distribute the cocaine base. In the Court's instructions to the jury, possession was broadly defined to encompass the types of acts—such as flushing cocaine down a toilet—which the government sought to attribute to Nenadich.[1]

The jury acquitted Nenadich of the charges in Count Three of the Indictment. To determine the collateral estoppel consequences of that acquittal, this Court must begin by "determin[ing] what the first judgment determined, a process in which ... the court must look not simply to the pleadings but to the record at the prior trial." *Kramer*, 289 F.2d at 913. Relying on *Mespoulede*, defendant Nenadich argues that the jury's acquittal necessarily determined that he did not possess cocaine base on December 16, 1987, and that he was not disposing of narcotics in the bathroom when the police arrived. The government, however, claiming that *Mespoulede* must be distinguished, argues that here the jury's verdict of acquittal did not necessarily resolve the issue of whether Nenadich possessed cocaine base or disposed of it in the bathroom. Specifically, the government argues that:

---

1. In the Court's charge, possession was defined, in part, as follows:

Actual possession is what most of us think of as possession—that is, having physical custody or control of an object. For example, if you find that the defendant had the drugs on his or her person, you may find that he or she had possession of the drugs. However, a person need not have actual physical custody of an object in order to be in legal possession of it.

\* \* \* \* \* \*

Possession of drugs cannot be found solely on the ground that the defendant was near or close to the drugs. Nor can it be found simply because the defendant was present at a scene where drugs were involved, or solely because the defendant associated with a person who does control the drugs or the property where they are found. However, these factors may be considered by you, in connection with all other evidence, in making your decision whether the defendant possessed the drugs.

A defendant may own or have control over the place where the narcotics are found, such as an apartment. \* \* \*. A defendant may also share ownership or control of the place where drugs are found. In this event, the drugs may be possessed by only one person, or by some of

the people who control the place, or by all of them. However, standing alone, the fact that a particular defendant had joint ownership or control over the place where the drugs were found is not sufficient evidence to find that the defendant possessed the drugs found there. In order to find that a particular defendant possessed drugs because of his or her joint ownership or control over the place where they were found, you must find, beyond a reasonable doubt, that the defendant knew about the presence of the drugs and intended to exercise control over them.

You should also be aware that more than one person can have control over the same narcotics. If this is so, then these people have what is called "joint possession." For purposes of determining the defendant's guilt, joint possession is no different from sole possession.

However, a defendant does not have "joint possession" of narcotics simply because he or she associates with a person who does have possession and control over the drugs. You cannot find that a defendant possessed the drugs unless you find that he or she exercised substantial control over them, either on his or her own or acting with others.

Tr. 603–606.

At [Mespoulede's] trial, Amy Bonk ... testified for the Government about events in the apartment on the evening of the arrests. She testified, in substance, that Mespoulede's role in the transaction was to cut and package the cocaine in preparation for its sale. Two DEA agents also testified that Mespoulede had confessed to cutting and packaging the cocaine.

Mespoulede's defense was characterized by the Court of Appeals as "a powerful attack on Bonk's credibility." 597 F.2d at 332. That attack was successful. The jury acquitted Mespoulede of possession with intent to distribute and hung on the conspiracy count.

Based on these facts, the trial judge "concluded that the jury had indeed decided that Mespoulede did not possess the cocaine beyond a reasonable doubt." 597 F.2d at 332.

\* \* \* \* \* \*

Specifically, the *Mespoulede* opinion was predicated on a factual finding which had already been made by the District Court—that the jury verdict established that Mespoulede did not do what the Government witnesses said he had done: cut and package cocaine on the night in question. 597 F.2d at 332.

\* \* \* \* \* \*

In contrast, the evidence of Nenadich's involvement was susceptible to more than one interpretation. Far from preparing drugs for sale, he was throwing them away. The Government argued that the evidence of Nenadich's participation in the conspiracy arose from his efforts to flush drugs down the toilet and throw them down the air vent. From that evidence the Government also asked the jury to draw the more tenuous inference that Nenadich also possessed

those drugs with intent to distribute them.

Government's Memorandum of Law in Opposition to Defendant Jorge Nenadich's Motion (hereinafter "Government's Memorandum"), at 8–10.

In the double jeopardy/collateral estoppel context, the government's attempted distinction of *Mespoulede* is inappropriate. As the government acknowledges, the government here argued at trial that the flushing of cocaine base down the toilet, the presence of drugs and drug sale paraphernalia in the apartment, and the presence of cocaine base elsewhere in the bathroom all were evidence that Nenadich possessed cocaine base, with intent to distribute, on December 16. Like Mespoulede, Nenadich attacked the credibility of the government agents who testified against him. Nenadich and his co-defendant questioned why the agents had not made a more thorough search of the vents in the bathroom and why certain DEA reports did not reflect the presence of cocaine base in the toilet or bathroom vents. *See, e.g.,* Tr. 233–34, 352–57, 364–66, 374, 377–78, 454–56, 467–68, 540–42, 548–49. The defendants questioned whether the agents had an incentive to report the finding of more cocaine than was actually present in the apartment. Tr. 266–74. Nenadich also challenged his alleged connection with the glassine bags, vials, and other paraphernalia of drug distribution. Apparently the attack on the agents' credibility was successful because the jury not only acquitted Nenadich of the charges in Count Three, but also found that the amount of cocaine base possessed by Nenadich's co-defendant, contrary to the assertions of the agents, was less than fifty grams.[2]

Based on the government's presentation of the evidence to show that Nenadich pos-

---

**2.** The government contended that the defendants possessed over 50 grams of cocaine base. The defendants argued that although close to 50 grams was found, in fact not more than 50 grams was found. The jury was asked to reach a special verdict on the amount of cocaine base possessed by any defendant found to have possessed the cocaine base with intent to distribute on December 16. The jury was asked whether the amount was more than fifty grams, less than fifty grams but more than five grams, or less than five grams. The jury found that defendant Santiago possessed less than 50 grams but more than five grams of cocaine base. The evidence at trial indicated that defendant Santiago possessed just under fifty grams of cocaine. *See* Tr. 501.

sessed cocaine base with intent to distribute, the "necessary" holding of the jury's verdict on Count Three is that Nenadich did not possess cocaine base on December 16, 1987. As in *Mespoulede,* this is not a case where the verdict of acquittal could have been predicated on a finding that Nenadich possessed cocaine but did not intend to distribute it. Here, the evidence in the apartment, as the government argued, did not allow an inference that the cocaine base was possessed without any intent to distribute. As the Court of Appeals stated in *Mespoulede,* "[i]n this respect, the case before us differs from *United States v. Seijo,* [537 F.2d 694, 698 (2d Cir.1976), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed. 2d 756 (1977)], where there was some evidence at trial to indicate that the small quantity of narcotics the defendant was charged with possessing could have been

retained for personal use rather than distribution." *Mespoulede,* 597 F.2d at 333.[3]

The government emphasizes that at trial, it claimed that "the evidence of Nenadich's participation in the conspiracy arose from his efforts to flush drugs down the toilet and throw them down the air vent." Government's Memorandum at 10. Although the government argues that the inferences to be drawn with respect to conspiracy were distinct from the inferences to be drawn with respect to the substantive crime charged in Count Three, the fact remains that, at trial, the government sought to use the commission of a substantive crime as evidence of Nenadich's membership in the conspiracy. At the same time, the government claimed that the alleged actions of Jorge Nenadich were evidence of the substantive offense in Count Three.[4]

3. Mespoulede was charged with possessing 1.2 kilos of cocaine and the court found "no one would retain such an enormous and valuable quantity of cocaine for personal use alone." 597 F.2d at 333. But in the present case as well, the government argued at trial that the amount of cocaine base, as well as the presence of glassine bags and other distribution paraphernalia, suggested that any possession was for the purpose of distribution. Indeed, what distinguished *Mespoulede* from *Seijo* was not the exact number of grams involved, but rather that in *Mespoulede,* as here, there was no evidence to indicate, or any suggestion, that the narcotics found were retained for personal use. In fact, the inference that the cocaine base in the apartment might have been retained for personal use was not argued by the defendants. Codefendant Santiago's attorney began his summation by remarking, "Ladies and Gentlemen, Carmen Santiago is a drug dealer. [We're] not disputing that.... Ladies and Gentlemen, you heard that 49.17 grams of crack were found in the apartment in which she lives. And if you find that she possessed it with intent to sell, convict her for that. That would be fair. And I'm not asking you to like Carmen Santiago. I'm not asking you to condone what she did." Tr. 505.

4. The government's summation reflected the government's effort to use the alleged possession, with intent to distribute, as evidence of the conspiracy to distribute cocaine base. The government began its summation by stating that "[w]hat I would like to do at the outset is review the evidence in the case in the context of that conspiracy charge. In the context of that agreement to violate the narcotics laws. Because when you look at that charge, you really do get to see the big picture." Tr. 482.

Although the government discussed the evidence of Nenadich's alleged December 16 possession in large part in the context of the conspiracy charge, the government also emphasized that Nenadich's actions, and the other evidence found in the apartment, all showed an intent to distribute—that is, the object of the alleged conspiracy. After describing the alleged disposal of cocaine base in the bathroom, the government stated:

"Now, Ladies and Gentlemen, that is just what was going on in the bathroom. But you've heard about the evidence of other things that were seized in the apartment that night. It's important to go through that evidence because it's important to understand that Jorgie Nenadich lived in that apartment. That he and Carmen Santiago were together in this business."

Tr. 494–95.

After discussing the evidence found in the apartment, the government linked the evidence to possession with intent to distribute:

"So, there is no question that he was involved and living in that apartment, that he was involved with the drugs that were in there. Let's think for a moment about what was found there, and what it says to you about Jorgie and Lydia and how they conducted themselves, what they were doing. Is this evidence of a drug conspiracy or not? The beeper, you hear, the testimony about beepers, Ladies and Gentlemen, it allows drug dealers to communicate with other people without using telephone calls, having them be intercepted, having them to be taped like they were in this case. You beep from a pay phone, they call you back from a pay phone, everything is cool. That's why drug dealers

*Mespoulede* indicates that a "necessary" finding by a jury is not a finding which makes any other inference inconceivable. Indeed, in *Mespoulede,* the jury's acquittal on the substantive count did not technically rule out the possibility that the defendant's presence in an apartment, where drug sale activity was occurring, might have been some evidence of the defendant's involvement in a conspiracy. Mespoulede was in fact arrested, on the night in question, in close proximity to 1.2 kilograms of cocaine, a triple-beam balance, and various implements for cutting cocaine. Yet the Court in *Mespoulede* held that realistically, the jury's verdict could only be viewed as finding the defendant to have been uninvolved in any of the activity charged in the substantive count, and therefore any evidence related to that activity could not be introduced at a retrial on the conspiracy count. In the present case, contrary to the government's position, it is similarly inescapable that the verdict of the jury to acquit Nenadich of the charges in Count Three reflected a finding that Nenadich did not flush drugs down the toilet or place them in air vents, and that Nenadich did not possess any other drugs or drug parapher-nalia located in the apartment on December 16.

Especially significant in this case is the fact that the government presented substantial evidence, from dates other than December 16, of Nenadich's participation in the conspiracy. For example, in summarizing the government's evidence of an October 14, 1987, meeting between defendant Santiago and DEA undercover agents, the prosecutor stated:

> ... they meet Lydia. The have some conversation in the shack there, at the auto repair yard. And you can listen to the transcript of that tape, it's in evidence, Ladies and Gentlemen. If you want during your deliberations you can ask and the judge will provide you with a transcript of that tape. You can look it over. You're entitled to do that, Ladies and Gentlemen. When you look it over, you can see all the references that are made in that transcript to the cocaine business that Lydia and Jorgie are operating together. * * * If it involves cocaine and you want it, Lydia and Jorgie will do it for you. You learn that.

Tr. 484–85. *See* GX 6A. The government also presented evidence of a phone conver-

---

use beepers. Little bags, red star—stamp to identify the drugs that you sell on the street. These are all found in bedroom one up here. This Marlboro cigarette pack found in there. With these red vials. Some of these vials are filled with crack. This is the way they sell crack on the street. Individual vials. This is the way they sell it. They were packaged up ready to go, put inside this Marlboro box. *But was this the only crack these people intended to sell? Certainly it was not.* How do we know that? They got some empty ones here, Ladies and Gentlemen, you can see them. Ready to be packaged up with the scale, and the vials and the caps. What are they going to put in there, Ladies and Gentlemen? This. That's what they're going to put in there and sell. Part of their drug business, Ladies and Gentlemen. A police scanner, two way radio. Why do they have these things in that apartment? Why do they need to monitor police and DEA frequencies on the radio. Because they are dealing drugs. A heat sealer, *Ladies and Gentlemen.* It's how you close bags like this; seal them up tight."
Tr. 496–98 (emphasis added).

The government's explicit discussion of Count Three in its summation did not reiterate the evidence of possession, but implicitly relied on the discussion of possession in the context of the conspiracy charge. The government at that point focused instead on the amount of cocaine base in the apartment. With reference to that amount, the government stated, "As it turned out, when all the analysis had been done, we have about 49.17 grams of crack that was left. What you have to decide is whether before Jorgie went to work that night, when the police officers, agents, came in there was more than 50 grams." Tr. 501. The government argued that, "it is clear Jorgie Nenadich was disposing of that crack on the night in question. And he shouldn't benefit in any way from the fact that he was flushing it, shoving it down the vent, and getting rid of the big stash. Because you know, Ladies and Gentlemen, this was a significant drug conspiracy, this was a significant drug operation, they were distributing from different locations, they were taking it to Puerto Rico." Tr. 502–03. In conclusion, the government told the jury that "the government has proved beyond a reasonable doubt that these two defendants, Jorge Nenadich and Lydia Carmen Santiago, possessed with intent to distribute a quantity of crack on December 16, 1987. That they intended to distribute that crack, and that that crack was at least between five and 50 grams." Tr. 503–04.

sation between defendant Santiago and a government agent on December 15, 1987. The prosecutor observed in his summation:

One other interesting thing about the December 15 phone call. In the beginning of the phone call [Santiago] knows that it's Jimmy's friend. Then she says, "Is it Jimmy?" She's a little confused. She knows it's something to do with the drug business. She says, "You want to speak to Jorgie?" What's the significance of that? Jorgie comes back from Puerto Rico now and she knows this call has to do with something with the drug business. She says, "You want to speak to Jorgie?" Jorgie is back now and he's going to reassume his role in the drug business.

Tr. 488–89. *See* GX 7A.

Given the evidence of conspiracy not related to December 16, 1987, the jury's inability to reach a verdict on the conspiracy charge need not be understood to indicate, as the government argues, that the jury could not determine whether Nenadich had indeed possessed cocaine base, or disposed of cocaine base in the bathroom, on December 16. Rather, under the circumstances of this case, to allow the government to present evidence relating to December 16 at a retrial of Nenadich on the conspiracy charge would simply give the government the opportunity to relitigate issues already resolved in defendant's favor. This the Double Jeopardy Clause will not allow.

The government suggests that reliance on the rationale of *Mespoulede* is inappropriate in any event, because its holding has been limited by more recent decisions of the Second Circuit. However, those recent cases have not undermined either *Mespoulede*'s holding or its rationale. *Mespoulede* dealt with the specific circumstance of a defendant who had been acquitted of a substantive offense, with a mistrial on a conspiracy charge. The Court of Appeals held that under the special circumstances of that case, evidence regarding that substantive offense could not be used in a subsequent retrial on the conspiracy charge because the only inference to be drawn from the jury's acquittal was that

the defendant did not perform any of the substantive acts charged in the indictment. *United States v. Clark*, 613 F.2d 391 (2d Cir.1979), *cert. denied*, 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), cited by the government, involved a defendant who was acquitted at his first trial of *conspiracy* charges, but subject to retrial on the substantive charge of importing heroin. Rather than limit *Mespoulede*, the Court in *Clark* distinguished its facts by observing that the burden on the defendant in the collateral estoppel context "is particularly onerous where the acquittal in the first trial involves the crime of *conspiracy*." *Id.* at 400 (emphasis added). The Court in *Clark* rejected the defendant's collateral estoppel claim because "it appear[ed] that the first jury could have rationally acquitted the appellants of conspiracy without deciding they were innocent of importing heroin into the United States." *Id.* at 402. A similar inference was not possible in *Mespoulede*, nor in the present case.

In *United States v. Medina*, 709 F.2d 155 (2d Cir.1983) (per curiam), also cited by the government, the defendant was acquitted at his first trial of charges that he conspired to rob a bank and that he aided and abetted an *armed* bank robbery. The jury was unable to reach a verdict on the charge of aiding and abetting a bank robbery (as opposed to an *armed* bank robbery). The Court concluded that the defendant could not invoke the collateral estoppel doctrine to prevent the introduction of evidence at a second trial because

the jury could reasonably have acquitted [the defendant] on [the aiding and abetting an *armed* robbery charge] because it believed the government had not sustained its burden of demonstrating appellant knew firearms would be employed in the robbery. Although it was undisputed the robbers were armed, there was no direct evidence indicating [the defendant] was aware of this fact. Accordingly, the jury could have concluded [the defendant] had not been proven guilty of aiding and abetting an armed robbery of a bank without resolving any of the essential

elements of [aiding and abetting a bank robbery].

*Id.* at 156 n. **.

Finally, in *United States v. Jackson,* 778 F.2d 933 (2d Cir.1985) (Friendly, J.), *cert. denied,* 479 U.S. 910, 107 S.Ct. 308, 93 L.Ed.2d 282 (1986), the defendant, as in *Clark,* was acquitted on a conspiracy charge, but the jury could reach no verdict on the substantive charge of possession of heroin with intent to distribute. Rather than reject *Mespoulede,* Judge Friendly explained its holding and distinguished the case from both *Jackson* and *Clark:*

> *Mespoulede* was essentially a replay of *Kramer.* After trial on a two-count indictment, the jury had acquitted Mespoulede on a count charging him with possessing cocaine with intent to distribute; it failed to agree on a verdict on the other count charging him with conspiring to distribute cocaine. We held that at the retrial of the conspiracy count, the prosecution should have been precluded from introducing the evidence with respect to possession which the jury had necessarily rejected at the first trial—even though the government was not required to establish possession in order to prove a conspiracy to distribute.
>
> \*   \*   \*   \*   \*   \*
>
> *United States v. Clark* reveals the other side of the coin. There, as here, the appellants had first been acquitted on a conspiracy charge ... but the jury failed to agree on substantive counts charging them with illegal importation.
>
> \*   \*   \*   \*   \*   \*
>
> When the first trial results in an acquittal on the *conspiracy* charge, generally there is no way of telling whether the basis for acquittal was disbelief of some portion of the Government's evidence, and what that portion might have been, or whether the jury simply regarded the evidence as insufficient to prove an

agreement, especially when, as here and in *Clark,* the Government's evidence did not place the retried defendant at the center of the conspiracy. \* \* \* There can thus be no general principle that, after acquittal on a *conspiracy* count, the Government may not retry a defendant on a related *substantive* count.

*Jackson,* 778 F.2d at 940 (citations omitted) (emphasis added). Thus, contrary to the government's suggestion, neither *Jackson,* nor *Clark* or *Medina,* rejects the holding in *Mespoulede* or the double jeopardy principles upon which that decision is based.

The government is certainly correct that an acquittal on one count of an indictment in no way entitles a defendant to an acquittal on any other count. And the defendant always bears the heavy burden of establishing that the jury's verdict of acquittal at the first trial necessarily resolved certain issues which cannot be relitigated at a second trial. The present case, however, involves the extremely rare circumstance, also present in *Mespoulede,* where the jury's acquittal on the substantive count at the first trial could only have been based on a determination that the defendant had not committed any of the acts alleged to have justified conviction on that substantive count.

Therefore, at any retrial of Jorge Nenadich on the conspiracy charges in Count One of the Indictment, the government shall be barred from introducing evidence relating to the alleged possession of cocaine base for which Nenadich was acquitted. This means that all evidence concerning Nenadich's alleged disposal of cocaine base in the bathroom of Apartment 10E, at 120 Baruch Drive, on December 16, 1987, and any other evidence of regarding Nenadich's own possession of drugs or drug paraphenalia in that apartment on that date, shall be inadmissible.[5]

Nenadich claims that this Court must also bar any retrial on the conspiracy count

---

5. Defendant Nenadich argues that in addition, agent Anthony Faretta should be precluded from testifying at a second trial because the jury's verdict of acquittal has rendered his testimony unworthy of any probative value. Nenadich's argument may be merely academic, be- cause at a retrial, Agent Faretta, like any other witness, will be barred from testifying with regard to Nenadich's alleged possession and disposal of cocaine base on December 16. However, it is only to this extent that Agent Faretta will be precluded from testifying.

unless the government proffers new evidence to support the conspiracy charge. At Nenadich's first trial, however, the government did introduce other evidence—primarily the conversations between co-defendant Carmen Santiago and undercover agents—as proof of Nenadich's participation in a drug conspiracy. Therefore, there is no basis for barring retrial at this time.

## CONCLUSION

Therefore, defendant Nenadich's motion is granted to the extent that at a retrial of Nenadich on Count One of the Indictment, the government shall be barred from introducing evidence relating to Nenadich's alleged possession of cocaine base on December 16, 1987, at apartment 10E, 120 Baruch Drive, in Manhattan. Defendant's motion is denied in all other respects.

SO ORDERED.